**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DANIELLE H. SIMMONDS and
SONYA HENDERSON,

                 Plaintiffs,

     – against –

THE NEW YORK CITY DEPARTMENT OF
CORRECTION; MARTIN F. HORN, *as*
*Commissioner of the New York City*
*Department of Correction*; and SHAUN
HALL, *individually*,

                 Defendants.

# JUDGE BUCHWALD

## 06 CV 5298

Civil Case No.:

**COMPLAINT AND**
**JURY DEMAND**



## PRELIMINARY STATEMENT

1.     Plaintiffs Correction Officer Danielle H. Simmonds ("Officer Simmonds" or "Plaintiff Simmonds") and Correction Officer Sonya Henderson ("Officer Henderson" or "Plaintiff Henderson") (collectively, "Plaintiffs") are correction officers employed by the New York City Department of Correction. Plaintiffs bring this action against their employers, the New York City Department of Correction ("the DOC") and Martin F. Horn, Commissioner of the New York City Department of Correction ("Commissioner Horn") (together, "the DOC Defendants"), and against Correction Officer Shaun Hall ("Officer Hall") (collectively, "Defendants").

2.     In October 2005, Officer Simmonds was sexually assaulted by Officer Hall, a male co-worker, while she was on duty.

3.     In March 2005, Officer Henderson was brutally attacked in an act of domestic violence committed by Correction Officer Franklyn Hill ("Officer Hill"), her

then-boyfriend and co-worker, who, upon information and belief, continues to stalk her.

4.      Officers Simmonds and Henderson reported their co-workers' violent acts to their respective supervisors at the DOC in hopes that the DOC would investigate their allegations and discipline the perpetrators of the violence, as is required by DOC policy, and would make reasonable accommodations to Plaintiffs as victims of sexual assault and domestic violence, as is required by New York City law.

5.      Plaintiffs' reports fell on deaf ears.  Instead of performing an investigation into the incidents of violence or punishing the perpetrators, the DOC has discriminated against Plaintiffs based on their sex and based on their status as victims of sexual assault and domestic violence.  In addition, the DOC has retaliated against Plaintiffs because they asserted their rights under federal, state, and local civil rights law and under DOC policy.  The DOC has also refused to provide Plaintiffs with certain accommodations that they have requested and that, as victims of sexual assault and domestic violence, they are guaranteed by law.

6.      Upon information and belief, the DOC has responded in a similar manner to other reports of sexual assaults and other gender-motivated crimes committed by male correction officers against female correction officers.

7.      In contrast, the DOC has in effect granted impunity to the male correction officers who perpetrated these crimes of violence, going so far as to transfer one of them to a post he had long desired.  Upon information and belief, the DOC has similarly treated other male corrections officers accused of sexual assaults and other gender-motivated crimes against female correction officers.  The DOC, through its responses to Plaintiffs' and other female correction officers' reports, has created and fostered a

discriminatory workplace culture that disrespects women and revictimizes victims of sexual assault, domestic violence, stalking, and other gender-motivated violent crimes.

8.     As a result of Defendants' actions, Plaintiffs have suffered emotional distress, physical injury, and financial harm.

9.     Plaintiffs bring this action seeking injunctive, declaratory, and other equitable relief; monetary damages; and attorneys' fees based on the DOC Defendants' violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; the New York State Human Rights Law, McKinney's Exec. Law § 290 *et seq.*; the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107 *et seq.* and 8-903 *et seq.*; and also for the DOC Defendants' negligent hiring, retention, and supervision; and Defendants' intentional infliction of emotional distress, and acts of gender-motivated violence.

10.    These remedies are sorely needed to compensate Plaintiffs for the grave harms that they have suffered as a result of Defendants' actions, and to end a culture of impunity at the DOC that permits, and indeed may even promote, the commission of sexual assaults and other gender-motivated crimes by male correction officers against female correction officers.  Without clear and decisive judicial intervention, the DOC will continue to discriminate and retaliate against Plaintiffs and other female correction officers who assert their legal rights to be free from such violence and who refuse to accept the perpetuation of a traditional "boys-will-be-boys" attitude at a historically male institution.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as a case arising under the laws of the United States; under 29 U.S.C. § 1343(a)(4), as a case seeking relief under an Act of Congress providing for the protection of civil rights; under 42 U.S.C. § 2000e-5(f)(3), as a case brought under Title VII of the Civil Rights Act of 1961, 42 U.S.C. §§ 2000e *et seq.*; and under 28 U.S.C. § 1367, as a case alleging state law claims that warrant the exercise of this Court's supplemental jurisdiction.

12.     On June 12, 2006, both Plaintiffs received notice of their right to sue from the Equal Employment Opportunity Commission ("EEOC"), in accordance with 42 U.S.C. § 2000e-5(f).

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Southern District of New York and because the DOC Defendants have offices, conduct business, and can be found in this district.

## THE PARTIES

14.     Plaintiff Officer Simmonds is a twenty-seven-year-old woman who resides in Bronx, New York.  She is a single mother of three children.  She has been employed as a DOC correction officer since December 20, 2001.  Her duties include care, custody, and control of individuals detained in DOC facilities.

15.     Plaintiff Officer Henderson is a forty-four-year-old woman who resides in Brooklyn, New York.  She has been employed as a DOC correction officer since

September 27, 1990.  Her duties include care, custody, and control of individuals detained in DOC facilities.

16.     Defendant DOC is an agency of the City of New York.  Its principal office is located at 60 Hudson Street, New York, New York 10013.

17.     Defendant Commissioner Horn is Commissioner of the DOC.  His office is located at 60 Hudson Street, New York, New York 10013.  Commissioner Horn is named as a defendant in his official capacity.

18.     Upon information and belief, Defendant Officer Hall is and has been, at all relevant times thereto, a correction officer at the DOC Rikers Island Correctional Facility ("Rikers Island"), located on Rikers Island, New York.  Officer Hall is named as a defendant in his individual capacity.


## BACKGROUND FACTS

### A.     Allegations Pertaining to Officer Danielle H. Simmonds

19.     On October 24, 2005, at approximately 1:00 a.m., Officer Shaun Hall sexually assaulted Officer Danielle Simmonds while Officer Simmonds was on duty at Rikers Island.

20.     Upon information and belief, Officer Hall was off duty and thus not permitted to be present on DOC premises at the time.

21.     Prior to the night of October 24, Officer Simmonds had occasionally seen Officer Hall on Rikers Island but had never had any personal interactions with him.

22.     The night of October 24, Officer Hall entered the General Office in the Anna M. Kross Center ("AMKC"), one of the ten jails located on Rikers Island, and

grabbed and pinched Officer Simmonds's breasts, pushed his body against hers, and ripped her uniform shirt.  In the struggle to push Officer Hall away, Officer Simmonds sprained her wrist.

23.     Officer Simmonds repeatedly told Officer Hall to get off of her and that she was going to notify a supervisory officer.  Officer Hall told her, "I'll do one better for you," and proceeded to telephone Captain Eaton, a Supervisory Officer.  Officer Hall said to Captain Eaton, "Hey, Cap, I have someone here that wants to tell you something," and threw the phone at Officer Simmonds.

24.     Officer Simmonds told Captain Eaton that she had just been sexually assaulted by Officer Hall.  Captain Eaton told her that he would immediately send Captain Tucker, an Area Supervisor, to her post.  After she hung up the phone, Officer Hall said, "Oh, so it's like that.  You should be lucky that anybody wants to touch you anyway.  You know what, fuck you!"  Officer Hall then ran out of the office.

25.     Subsequently, Officer Simmonds met with Captain Tucker and Deputy Warden Tindell, who took photographs of her ripped uniform and escorted her to a medical clinic on Rikers Island.

26.     Officer Simmonds was then transported by EMS to Mount Sinai Hospital.  The hospital reported the assault to the New York City Police Department ("NYPD").  A NYPD officer arrived at the hospital, interviewed Officer Simmonds, and completed a police report describing the sexual assault and naming Officer Hall as the assailant.  Officer Simmonds was treated at the hospital for bruises on her breast and a sprained wrist.

27.     On October 26, 2005, Officer Simmonds returned to work.  She was transferred immediately to a different facility, the Vernon C. Bain Center ("VCBC"), and told to report to Administrative Personnel Captain Georgia Stoutt.

28.     Although Officer Simmonds had never met Captain Stoutt before, Stoutt treated her in a suspicious and hostile manner.  Stoutt sarcastically told Officer Simmonds's union delegate, in front of Officer Simmonds and three other people, "You know why she's here and so does everyone else."

29.     Officer Simmonds understood this statement to mean that everyone working at VCBC knew about the assault.  Officer Simmonds felt humiliated.

30.     On October 26, 2005, Officer Simmonds made an official complaint to the DOC Complaints Division about the on-the-job sexual assault by Officer Hall.  She was subsequently told that Investigator Rojas in the DOC Investigative Division on Rikers Island would be in charge of investigating her complaint.

31.     To this date, Investigator Rojas has never contacted Officer Simmonds and has not returned her many calls to him.

32.     After the assault, and upon Officer Simmonds's request, the DOC referred her to Dr. John McCann, a psychotherapist.  On October 26, 2006, Dr. McCann ordered her to take an indefinite sick leave because she was suffering from post-traumatic stress disorder due to the sexual assault.

33.     On information and belief, the DOC has never appropriately investigated the sexual assault or disciplined Officer Simmonds's assailant, Officer Hall.

34.     On information and belief, complaints against Officer Hall have been made to the DOC in the past.

35.     In October, November, and December 2005, on four separate occasions after the assault, the DOC charged Officer Simmonds with violating DOC policies related to sick leave and/or took disciplinary action against her for these purported violations. The relevant provisions of these policies are listed below.

36.     Section (III)(A)(1) of DOC Directive 2262R states, in relevant part, that correction officers who, while off-duty, need to report sick "shall communicate with the H.M.D. [DOC Health Management Division, or "HMD"] Sick Desk at least one (1) hour prior to the beginning of their scheduled tour of duty. . . . The person receiving the sick report at H.M.D. shall transcribe the information reported . . . on the EMPLOYEE'S SICK REPORT [sic] . . . and give the Sick Report Log Number to the caller." *See* The New York City Department of Correction Directive 2262R, Sick Leave Regulations for Members of the Uniformed Force, dated 08/24/87 ("Directive 2262R"), attached hereto as Exhibit A.

37.     Section (III)(E) of DOC Directive 2262R requires certain members of the uniformed force to "log out" whenever they leave their homes during sick leave. Specifically, Section (III)(E) permits correction officers who are on sick leave and who have reported sick for nine or more days in one calendar year or who are classified as "chronic absent" to leave from and return to their residence without prior permission from the DOC only during a designated four-hour period ("recreation hours") each day. According to the policy, "[u]niformed members on sick leave who are granted a four (4) hour block of time out-of-residence (recreation hours) by H.M.D. are not required to notify the sick desk on leaving from or returning to their place of confinement for that period of time." "During these hours," the policy states, "members are expected to attend

to their personal needs and activities. . . ."  Otherwise, the policy forbids such individuals from leaving their residence "except for visitation with their personal physician, a hospital, H.M.D., or where contractually permitted. . . . "  In such cases, correction officers "shall first notify the H.M.D. sick desk by telephone" before leaving their residence. *See* Directive 2262R, attached hereto as Exhibit A.

38.     According to DOC policy, a correction officer who reports sick 12 or more days within a 12-month work period is labeled "chronic absent."  The "chronic absent" designation remains in effect for six months after the correction officer returns to duty, and a current or former "chronic absent" designation can subject an officer to disciplinary sanctions, including termination, and can negatively affect an officer's access to benefits and privileges such as promotions, a steady tour, transfers, and specific assignments. *See* The City of New York Department of Correction Directive 2258R-A § (II), Absence Control/Uniformed Sick Leave Policy, dated 02/14/00, ("Directive 2258R-A"), attached hereto as Exhibit B.

39.     DOC policy makes clear, however, that an absence from work due to an on-the-job incident that results in serious injury – which includes injuries related to on-the-job sexual assaults – "shall be excluded in the calculation of use of sick leave."  Thus, correction officers who miss work as the result of on-the-job sexual assaults should not be punished by being designated "chronic absent."  *See* Exhibit B; *see also* The City of New York Department of Correction Directive 5000R-A § (IV), (V)(B), Reporting Unusual Incidents, dated 04/13/92, ("Directive 5000R-A"), attached hereto as Exhibit C.

*First Disciplinary/Retaliatory Action Against Officer Simmonds*

40.     As explained above in paragraph 32, Officer Simmonds sought assistance from a DOC-affiliated psychotherapist, Dr. John McCann, after the sexual assault.

41.     On October 26, 2006, Dr. McCann, Officer Simmonds's DOC-appointed psychotherapist, called HMD and explained that, in his opinion, Officer Simmonds was suffering from post-traumatic stress disorder as a result of the sexual assault and needed to take sick leave.  Upon the psychotherapist's advice, HMD ordered Officer Simmonds to take sick leave.

42.     From October 26, 2005, to November 12, 2005, Officer Simmonds took sick leave from work, as a result of the trauma and stress that she was suffering because of the sexual assault by Officer Hall.  Because taking this time off resulted in Officer Simmonds having reported sick more than nine days in one calendar year, HMD placed her on what is colloquially known amongst correction officers as "house arrest" – i.e. restricting a correction officer's time out of residence (or "recreation hours") to four hours per day, pursuant to Section (III)(E) of DOC Directive 2262R.  *See* Exhibit A.

43.     On October 28, 2005, the DOC charged Officer Simmonds with violating Section III(A)(1) of Directive 2262R on the prior day, October 27, 2005.  *See* Exhibit A. The DOC alleged that Officer Simmonds had not called in to the DOC one hour prior to her tour of duty, as required by DOC policy.  However, as the DOC knew, Officer Simmonds was on sick leave on October 27, 2005, and therefore was not obligated to work that day.  Moreover, it is common practice at the DOC for correction officers who are on indefinite sick leaves to call in sick only on the first day of their leave period, not every day thereafter.

44.     Officer Simmonds received a warning and no penalty.  Because this was the first charge leveled against Officer Simmonds, and because she received only a warning and no penalty, she did not appeal the charge, even though she believed it was unfair and not in accordance with DOC policy.

_Second Disciplinary/Retaliatory Action Against Officer Simmonds_

45.     On November 2, 2005, the DOC again wrongly charged Officer Simmonds with violating Directive 2262R.  This charge alleged, incorrectly, that Officer Simmonds had failed to properly log out under Section (III)(E) when she left her home for a doctor's appointment on November 1, 2005, the previous day.  The DOC stated that a DOC officer had been sent to Officer Simmonds's house during her non-recreational hours and that she was not at home, allegedly in violation of DOC policy.  According to the charge, the penalty for the alleged violation would be the withholding of four vacation days.

46.     In fact, Officer Simmonds had properly logged out, in compliance with Section (III)(E) of Directive 2262R, when she left her home the previous day to attend her doctor's appointment.  The purpose of this doctor's appointment was related to Officer Simmonds's sexual assault-related injuries.  Officer Simmonds had called HMD before 5:00 p.m., when her "recreation hours" period ended, to notify HMD that she was still at her doctor's office and that she would be heading home immediately after her appointment.  She was given a log out confirmation number by HMD.

47.     On November 2, 2005, the day she was charged, Officer Simmonds submitted an Inter-Departmental Memorandum to the DOC challenging the charge, and presented evidence demonstrating that she had properly logged out, pursuant to DOC

procedure, on the previous day. This evidence included a confirmation from both Officer Simmonds's doctor and her union that she was at the doctor's office when the DOC officer came to her house, as well as the log out confirmation number given to her by HMD.

48.    Deputy Warden Merrett then oversaw a hearing that same day in which she rejected Officer Simmonds's challenge to the charge and took away four vacation days from Officer Simmonds. Deputy Warden Merrett also told Officer Simmonds that if she did not waive her rights to appeal this determination, she would be subject to further discipline in the form of suspension. In the face of this coercion, Officer Simmonds waived her appeal rights.

49.    In a subsequent meeting with Officer Simmonds, Warden David Goodman verbally dismissed the November 2, 2005 charges, and guaranteed Officer Simmonds that the charges would be removed from her record and that the DOC would return her four vacation days to her. However, as explained further below, these charges were not dismissed, nor were they removed from Officer Simmonds's record, and the DOC did not return her four vacation days to her.

*Third Disciplinary/Retaliatory Action Against Officer Simmonds*

50.    On November 14, 2005, the DOC notified Officer Simmonds that she was being designated "chronic absent," pursuant to Directive 2258R-A, as the result of her sick leave following the October 24 sexual assault by Officer Hall.

51.    Because Officer Simmonds's "chronic absent" designation was directly related to sick leave that she had taken as the result of an on-the-job assault by a fellow employee, she appealed the "chronic absent" designation, following the appeal procedure

laid out in Directive 2258R-A.  Her appeal was denied, with contradictory rationales

given by her supervisors for the denial.  *See* "Appeal – Chronic Absence Extension

Designation", attached hereto as Exhibit D.

52.    As the result of the "chronic absent" designation, Officer Simmonds was

stripped of the two benefits that her supervisors knew she relied upon most as a single

mother – the right to work discretionary overtime for a higher wage and the right to

exchange shifts with other officers for greater schedule flexibility (known as "mutuals").

However, Section (III)(G)(4) of Directive 2258R-A specifically states that officers

designated "chronic absent" are not automatically stripped of these and other

discretionary benefits and privileges.  *See* Exhibit B.

53.    As a result of these unfair penalties, Officer Simmonds was unable to

arrange her schedule in order to accommodate her childcare obligations.

54.    Furthermore, as an officer with a "chronic absent" designation, Officer

Simmonds risked more serious penalties, including termination, if she needed to take any

additional sick leave during the six-month period of her "chronic absent" designation.

55.    Although Officer Simmonds's doctor directed her to take time off after the

sexual assault (1) to heal from the stress and trauma she endured from both the assault

and the DOC's subsequent discriminatory and retaliatory treatment of her, and (2) to

undergo medically-necessary surgery, Officer Simmonds did not take this time off within

the six-month period during which she was designated "chronic absent", because she did

not want to risk additional sanctions at work, including the loss of her job.

*Fourth Disciplinary/Retaliatory Action Against Officer Simmonds*

56.   On December 2, 2005, another charge was brought against Officer

Simmonds.  The charge indicated that Officer Simmonds had violated the DOC's sick

leave regulations (*see* Exhibit A), and thus that she was poised to lose four more vacation

days, because although she had properly logged out, she had failed to "log in" after

returning to her residence from a doctor's appointment on October 28, 2005.

57.   Officer Simmonds had not logged in after returning to her residence on the

date in question because she had returned to her residence during her recreation hours.

According to Section (III)(E)(10) of Directive 2262R, "[u]niformed members on sick

leave who are granted a four (4) hour block of time out-of-residence (recreation hours) by

H.M.D. are not required to notify the sick desk on leaving from *or returning to* their

place of confinement during that time."  (emphasis added).  *See* Exhibit A.

58.   The charge ordered Officer Simmonds to appear for a disciplinary hearing

scheduled for December 5, 2005.  Because of the short notice – only one business day –

she requested an adjournment of the hearing to give her time to collect the necessary

documentation to refute the charge and consult with her attorneys.  Her supervisor,

Deputy Warden Jerome Davis, granted her a twenty-four hour adjournment.  In refusing

to grant a longer adjournment, he stated,  "In any event, I am going to find you guilty."

Deputy Warden Davis then said to Officer Simmonds, "I'm not sure if a sexual assault

even occurred," even though he had received on at least two separate occasions a DOC

report documenting the sexual assault on Officer Simmonds by Officer Hall.

59.   At the disciplinary hearing on December 6, 2005, Officer Simmonds

showed Deputy Warden Davis an HMD Case Disposition Form directed to correction

officers that states, in relevant part, that "you are not required to log in or out for the specified time out of residence that has been granted by HMD." Officer Simmonds explained that as she interpreted this form, correction officers returning to their residence during recreation hours while on sick leave are not required to log in to HMD.

60.    Deputy Warden Davis dismissed Officer Simmonds's explanation of her interpretation of the HMD Case Disposition Form. Despite this evidence demonstrating that she had followed proper DOC procedure, Deputy Warden Davis found Officer Simmonds guilty of violating the DOC's sick leave policy by failing to properly "log in" while on sick leave, and penalized her by stripping her of four additional vacation days. Deputy Warden Davis told Officer Simmonds that he was finding her "guilty because you misinterpreted the sentence. When you log out, you always have to log back in, regardless of when you are returning home."

61.    During the course of the hearing, Deputy Warden Davis repeated his belief that, "I'm not sure what happened to you was even an assault." After the hearing, he said to Officer Simmonds's union delegate, "By no means am I gonna cater to this girl," referring to Officer Simmonds.

62.    During a subsequent meeting with Deputy Warden Davis on March 1, 2006, in which the subject of the assault arose, he said to Officer Simmonds, "You took two days off, right? How could what happened to you have been so serious if you could come back to work two days later?"

*Fifth Disciplinary/Retaliatory Action Against Officer Simmonds*

63.    On January 18, 2006, when Officer Simmonds's supervisors, including Personnel Captain Stoutt ("Captain Stoutt"), were scheduling shifts for Officer

- 15 -

Simmonds and other correction officers, Officer Simmonds gave Captain Stoutt documentation reflecting that she would be starting classes at a local university on January 28, 2006. Officer Simmonds requested permission to remain stationed on the midnight shift so that she could attend these classes. It is common for correction officers to make such requests, and typically such requests are granted.

64.     Instead, on January 31, 2006, Captain Stoutt changed Officer Simmonds's shift from the midnight shift to the less desirable "wheel," which meant that her new work schedule would consist of three different shifts that change every three days, rather than the steady and regular midnight shift that she had previously worked.

65.     As Captain Stoutt knew at the time she changed Officer Simmonds's shift, it was impossible for Officer Simmonds to attend her classes with this revised schedule. Officer Simmonds had already signed up for the classes and was thus obligated to pay the university her tuition in full, and courses had started three days before she was notified of the shift change. She is still paying off the tuition to this day.

66.     Officer Simmonds explained this predicament to Captain Stoutt and reiterated her request to remain on the midnight shift, but Captain Stoutt again denied her request.

67.     As a result of this shift change, Officer Simmonds was unable to attend her university classes.

68.     As a result of this shift change, Officer Simmonds was also unable to make adequate child care arrangements, due to the unpredictability of her schedule.

69.     Officer Simmonds was thus forced to leave her children with their grandfather in Virginia.  Officer Simmonds's separation from her children has caused her great anxiety.

*Sixth Disciplinary/Retaliatory Action Against Officer Simmonds*

70.     On May 15, 2006, Officer Simmonds's pocketbook, which contained her DOC shield and DOC identification, was stolen.  Officer Simmonds immediately reported the theft to the police.

71.     On June 16, 2006, Officer Simmonds was summoned to a DOC command discipline hearing before Deputy Warden Wettenstein concerning her DOC shield and identification that had been stolen along with her pocketbook on May 15.  Deputy Warden Wettenstein told Officer Simmonds that because she had been previously disciplined that year, her previous charges would increase the severity of the current penalty against her for losing her shield and identification.

72.     Officer Simmonds explained to Deputy Warden Wettenstein that those charges had been made incorrectly, and that Warden Goodman had previously verbally dismissed the November 2, 2005 charges and guaranteed that the charges would be removed from Officer Simmonds's record and that her four vacation days that were taken away in November 2005 would be returned to her.  Deputy Warden Wettenstein responded that the November 2005 charges and the four vacation day penalty are still in Officer Simmonds's record, and that as a result, he had to penalize Officer Simmonds by taking away an additional five vacation days.  However, he ultimately agreed to reduce this penalty to three days.

73.    Officer Simmonds did not appeal this penalty, because she believed it would be futile to do so.

*Officer Simmonds's Experience at DOC Correction Officer Training in July 2006*

74.    On July 10 and 11, 2006, Officer Simmonds attended a department-wide training for correction officers that included, *inter alia*, training on the DOC's Equal Employment Opportunity ("EEO") policies.  The EEO portion of the training lasted a total of approximately 15 minutes, and no EEO materials or policy manuals were distributed or even mentioned.  The officer who conducted the training referred on at least two occasions to "female correction officers' asses."  In setting forth an example of a comment that would violate the DOC's EEO policy, he said, "now you male correction officers can't make comments like 'that female correction officer has a big ass!'"  The trainer started laughing, as did the class.

75.    According to DOC policy, EEO in-service trainings are supposed to take place yearly.  However, Officer Simmonds has only attended two EEO in-service trainings in her five-year tenure at the DOC.

76.    On another occasion, during CPR training, the captain conducting the training demonstrated a maneuver on a mannequin called a "jaw thrust."  The captain said, wryly, "now put your fingers on the cheeks – but not those cheeks!"  The class began laughing, understanding that the captain was referring to the mannequin's buttocks.  Laughing, the captain continued, "Make sure that you thrust correctly when you open up the cheeks."

77.   Officer Simmonds interpreted the remarks made by these trainers to be disrespectful to women and reflective of a general atmosphere at the DOC that subjugates and marginalizes female correction officers.

*Officer Simmonds's Repeated Requests to the DOC for Information Concerning Officer Hall Have Been Ignored*

78.   It is important for Officer Simmonds's personal safety for her to know where Officer Hall is stationed and what his schedule is.

79.   Officer Simmonds has requested on several occasions since October 2005 that the DOC provide her with this information and describe what steps it has taken with respect to investigating or disciplining Officer Hall, but has received no response.

80.   On March 1, 2006, over four months after the assault, Officer Simmonds spoke with a DOC Investigator who told her that Officer Hall had not been transferred after the assault, even though he should have been pursuant to DOC custom and practice. Under that custom and practice, the Investigator said, when two correction officers have a disagreement, both are transferred to different worksites, regardless of which officer, if any, is found to be culpable. The Investigator did not provide her with any further information on Officer Hall's whereabouts or schedule; on the DOC's investigation or discipline of Officer Hall's sexual assault; or on standard DOC practices concerning the transfer of correction officers.

81.   Officer Simmonds has never learned why only she, and not Officer Hall, was transferred after the assault. She interprets the DOC's decision to only transfer her as yet another form of discrimination, harassment, and retaliation against her for asserting her right to be free from sexual assaults and other gender-motivated violence.

82.    Officer Simmonds's attorneys wrote to and telephoned the DOC on her behalf on several occasions between December 2005 and May 2006 (i) to urge the DOC to withdraw the retaliatory disciplinary measures against her; (ii) to request information on Officer Hall's assignments and work schedule so that Officer Simmonds can protect herself from him; and (iii) to seek information on steps the DOC has taken to address Officer Hall's behavior.   The DOC has thus far failed to respond.

*The Disciplinary Actions Taken by the DOC Against Officer Simmonds Are Baseless, Unduly Harsh, Discriminatory, and Retaliatory*

83.    The charges and disciplinary actions taken against Officer Simmonds, described in detail above, were baseless, discriminatory, and imposed in retaliation against Officer Simmonds for complaining about Officer Hall's assault.   As a result of the retaliatory schedule changes and the loss of voluntary overtime and mutuals privileges, Officer Simmonds was forced to leave her children with their grandfather in Virginia.   She was unable to take the course for which she had registered and lost her tuition.   In addition, DOC charges carry penalties and, as a result of the recent charges against her, Officer Simmonds has lost eleven vacation days and is subject to additional penalties.   Such penalties can also affect correction officers' opportunities for promotions and other privileges.   As a result of these penalties, she was unable to schedule medically-necessary surgery and to take the time her doctors recommended to recuperate from the trauma of the assault.

84.    In her nearly five years as a correction officer at the DOC, Officer Simmonds has never been disciplined so harshly as she has been by the DOC since October 2005, after she reported to the DOC Officer Hall's sexual assault upon her.

85.     Officer Simmonds has contemplated quitting her job because of all of these hardships, as described above.

**B.      Allegations Pertaining to Officer Sonya Henderson**

*Acts of Domestic Violence and Stalking Committed by Officer Hill Against Officer Henderson*

86.     On March 3, 2005 at approximately 3:00 a.m., Officer Sonya Henderson was violently assaulted in her home by her co-worker and then-boyfriend, DOC Officer Franklin Hill.

87.     As a result of the assault, Officer Henderson sustained serious physical injuries to her head and face, including extensive damage to one eye, as well as to her back and her ankle.

88.     After she called 911, Officer Henderson was immediately taken by ambulance to Beth Israel Medical Center, where she was treated for a laceration to her eye.

89.     That morning, Officer Hill was arrested by the New York City Police Department for domestic violence and eventually pled guilty to misdemeanor assault for the March 3 attack.

90.     Upon information and belief, Officer Hill notified the DOC of the arrest, pursuant to a DOC policy that requires correction officers to notify the DOC within one hour of being arrested while off duty. *See* The City of New York Department of Correction General Order 001/98, Arrest of Employee Off Duty, dated 1/23/98 ("General Order 001/98"), attached hereto as Exhibit E.

91.     Approximately one hour after the emergency room doctors began treating her, Officer Henderson was transported from the hospital to the police precinct in a police car.

92.     Approximately one hour after she arrived at the precinct, two officers from the DOC Investigation Unit met Officer Henderson at the precinct.  They asked Officer Henderson to write a report summarizing the domestic assault, and took black and white photographs of her injuries.  The officers stayed at the precinct for approximately thirty minutes and then left.

93.     At the time, Officer Henderson believed that the written report would be used in a subsequent DOC investigation of Officer Hill's arrest, as required by DOC policy.  *See* The City of New York Department of Correction Operations Order 06/96, Arrest of Employee, dated 4/18/96 ("Operations Order 06/96"), attached hereto as Exhibit F; The City of New York Department of Correction Directive 7001R, Investigation Division, dated 09/28/92 ("Directive 7001R"), attached hereto as Exhibit G.

94.     The Kings County Criminal Court subsequently granted Officer Henderson an Order of Protection, effective until May 23, 2006, prohibiting Officer Hill from approaching, contacting, or assaulting Officer Henderson.

95.     On March 7, 2005, Officer Hill called Officer Henderson's home to harass her, in violation of the Order of Protection.  Officer Hill then called the phone company and had Officer Henderson's telephone service disconnected.

96.     Later that day, Hill was arrested for violating the Order of Protection against him and for criminal contempt.  Upon information and belief, Officer Hill

notified the DOC of this arrest, just as he had notified the DOC of the arrest four days earlier.

97.    Since that time, Officer Hill has continued to stalk, harass and threaten Officer Henderson, in violation of the Order of Protection. She has notified both the police and the DOC of these incidents.

*Officer Henderson's Request for Medical Leave*

98.    On March 4, 2005, the day after the assault, Officer Henderson sought medical leave from her position in the Central Control Room at Bellevue Hospital Prison Ward because of the injuries she sustained in the assault.

99.    Officer Henderson subsequently submitted her physician's medical reports to a physician at the DOC Health Management Division ("HMD"), as required by DOC policy. *See* Directive 2262R, attached hereto as Exhibit A. The medical reports described her injuries and explained that she needed several medical tests and procedures, including CT scans and x-rays.

100.    Following standard HMD practice, the HMD physician reviewed Officer Henderson's doctors' reports. Subsequently, Ms. Claudene Chang ("Ms. Chang"), an HMD Assistant Office Manager, approved Officer Henderson for "24-hour recreation hours" during her medical leave. This meant that Officer Henderson was permitted to leave her home at any time during her medical leave without obtaining prior permission from the DOC. *See* Exhibit A.

101.    Officer Henderson was directed to return to HMD every two weeks so that the HMD physician could review her medical records and decide whether or not to grant her additional medical leave.

102.    During her fifteen years as a correction officer, Officer Henderson's consultations with HMD physicians had generally been formalities that lasted approximately five minutes. Officer Henderson's first two meetings with the HMD physician in March 2005, after the assault, were similarly perfunctory.

*The DOC's Initial Retaliatory/Discriminatory Acts Against Officer Henderson*

103.    It is the policy of the DOC "that an unbiased and thorough investigation is conducted whenever any Department of Correction employee becomes the subject of an arrest." *See* Exhibit F. Such investigations "may include interviewing witnesses, police personnel, gathering evidence, etc." *Id.* "When any member of the Department is arrested for a New York criminal offense, the Investigations Department shall effect suspension when warranted." *Id.* The "Division shall then initiate charges, where warranted, within seventy-two (72) hours of said arrest" and the employee shall appear at the Trial Division "for service of charges, no later than the next business day." *Id.*

104.    Directive 7001R states that the: "Commissioner recognizes the need for investigating allegations and incidents of misconduct and violations of the Department's Directives and/or Rule and Regulations," and that the refusal of an employee to cooperate in such an investigation "may be cause for removal from employment, or other disciplinary action." *See* Exhibit G.

105.    The City of New York Department of Correction Operations Order 14/93, Criminal Suspension and Modified Duty Procedure, dated 04/27/93 ("Operations Order 14/93"), attached hereto as Exhibit H, requires that when a "member of service is arrested for felony or other serious offense the parent command shall request the suspension of the

member of service . . . [and] the Command shall then initiate charges within 72 hours of said arrest."

106.    By late March, no one from the DOC had contacted Officer Henderson regarding Officer Hill's March 3, 2005 domestic assault or his March 8, 2006 arrest for violating the Order of Protection.  Officer Henderson had received no indication from the DOC that an investigation into the incident was being conducted, even though such an investigation was required under DOC policies.

107.    On March 20, 2005, Officer Henderson mailed a letter to the DOC Commissioner, Commissioner Horn, and several other high-level administrators (i) inquiring whether the DOC was investigating the domestic violence incident; (ii) asking what assistance the DOC would provide to her as a victim of an assault committed by another officer; and (iii) informing the DOC that Officer Hill had committed acts of domestic violence in the past.  By writing this letter, Officer Henderson wanted to ensure that the DOC knew that a domestic assault had been perpetrated by one of its officers; that steps would be taken to ensure that she would not be subjected to Officer Hill's violence in the workplace; and that the DOC would accommodate her medical, mental health, and other needs as a victim of domestic violence perpetrated by a co-worker at the DOC.

108.    Officer Henderson wrote her March 20, 2005 letter based on her understanding that the DOC had not investigated, suspended, or otherwise punished Officer Hill for the assault, even though the DOC's own policies (i) require that investigations take place within 72 hours of the arrest of a correction officer (*see* Operations Order 06/96; Directive 7001R); (ii) permit the suspension, dismissal or other

discipline of correction officers who are arrested for felonies or other serious offenses or otherwise violate DOC rules and regulations (*see* Operations Order 06/96; Operations Order 14/93; The New York City Department of Correction Directive 7504R-A, Suspension From Duty And/Or Placement On Modified Assignment, dated 02/10/00 ("Directive 7504R-A"), attached hereto as Exhibit I; DOC Rules and Regulations § 3.20.030, attached hereto as Exhibit J); and (iii) bar correction officers who have been convicted of misdemeanor domestic violence crimes from carrying firearms or working at a post requiring the possession or use of firearms (*see* The New York City Department of Correction General Order 01/99, Domestic Violence & Personal Firearms, dated 03/19/99 ("General Order 01/99"), attached hereto as Exhibit K).

109.    On or about April 5, 2005, Officer Henderson went to her scheduled biweekly HMD visit.  This was her first visit to HMD since sending the March 20 letter to the DOC.  Upon her personal doctor's advice, she sought approval from HMD for the continuation of her medical leave.

110.    At this meeting, unlike her previous two visits, HMD administrators ordered Officer Henderson to submit to a psychological evaluation by an HMD physician, under threat of immediate involuntary commitment.

111.    As a result of this coercion, Officer Henderson agreed to meet with Dr. Theo, a DOC psychologist, who, after a consultation that occurred in front of other HMD staff and lasted approximately five minutes, told her that she was depressed and declared to DOC administrators that she was "psychologically unfit for duty."  Over the next two months, Dr. Theo continued to assert that Officer Henderson was psychologically unfit for duty and refused to allow her to return to work, even though Officer Henderson's

subsequent meetings with Dr. Theo never lasted more than approximately five minutes. To this day, Dr. Theo continues to designate Officer Henderson as "psychologically unfit for duty."

112.    Dr. Theo's unfounded conclusion that Officer Henderson was and is "psychologically unfit" may have significant consequences for her future employment. DOC administrators may unfairly stigmatize her as psychologically unstable and, as a result, consider her ineligible for future promotions and other job benefits at the DOC. This could also have adverse consequences for any other future employment that Officer Henderson might pursue.

113.    On April 19, 2005, Officer Henderson's social worker from HELP U.S.A., a domestic violence advocacy organization, accompanied Officer Henderson to her scheduled HMD appointment.  The social worker asked Ms. Chang, an HMD Assistant Office Manager, why Officer Henderson was required to see the DOC psychologist, when the DOC psychologist was offering no treatment and Officer Henderson was receiving outside support services.  Ms. Chang replied that this requirement had been imposed as a result of Officer Henderson's March 20 letter sent to DOC officials.

114.    In the same April 19, 2006, conversation, Ms. Chang stated to the HELP U.S.A. social worker that it is DOC policy that any individual involved in a domestic violence incident must see a DOC psychologist.

115.    In April 2005, Cynthia Leary, an HMD staff person, told Officer Henderson that Officer Hill had never received an evaluation by a DOC psychologist. On information and belief, the DOC has never required Officer Hill to be evaluated by a DOC psychologist.

116.    On August 5, 2005, Noreen Klein from the DOC's Equal Employment
Opportunity (EEO) office sent Officer Henderson's attorneys a letter stating that "HMD
does not <u>require</u> individuals involved in a domestic violence incident to see a DOC
mental health professional nor does HMD <u>mandate</u> psychological evaluations by HMD
mental health professionals as a condition of continuing on sick leave." (Emphasis in
original). Ms. Klein's assertion directly contradicted Ms. Chang's statements to Officer
Henderson's social worker, as described above.

*The DOC's Reassignment of Officer Henderson to "House Arrest"*

117.    On May 3, 2005, after Officer Henderson and her social worker made
these inquiries and raised these objections, the DOC abruptly reassigned Officer
Henderson from "24-hour recreation hours" to "house arrest" as a condition of her
medical leave. This reassignment meant that Officer Henderson could only leave the
house for four hours each day absent specific authorization from the DOC. No reason
was ever provided for this reassignment, even though Officer Henderson has repeatedly
asked for one.

118.    On May 13, 2005, Officer Henderson called the DOC and requested to log
out of house arrest, pursuant to DOC policy (*see* Directive 2262R(III)(E)(8)), in order to
meet with the Brooklyn District Attorney's office as a witness in its criminal case against
Officer Hill. The DOC denied her request, even though New York law requires
employers to give crime witnesses and victims time off to consult with the District
Attorney. *See* N.Y. McKinney's Exec. Law § 215.14.

*DOC's Designation of Officer Henderson as "Chronic Absent"*

119.    On June 21, 2005, the DOC notified Officer Henderson that she had been designated "chronic absent," and that this designation would remain in effect for six months.

120.    Only after Officer Henderson appealed her "chronic absence" designation in July 2005, arguing that she was a victim of domestic violence committed by a fellow correction officer, and that she should not be stigmatized as a 'sick leave abuser' for her absences since March 2005, all of which had been the direct result of the domestic violence, did DOC rescind this designation.

*The DOC's Repeated Refusal to Reasonably Accommodate Officer Henderson*

121.    Beginning in May 2005, Officer Henderson, through her attorneys, has repeatedly asked DOC officials for information about (i) Officer Hill's schedule, employment status and employment placement; (ii) investigatory or disciplinary steps taken with respect to Officer Hill; (iii) whether the DOC had required Officer Hill to undergo psychological counseling; and (iv) whether, to its knowledge, Officer Hill has access to firearms.

122.    Officer Henderson has sought this information both as a reasonable accommodation so that she could take the steps necessary to protect herself from Officer Hill on and off the job, and because she has serious concerns that the DOC has discriminatorily ignored its own policies in failing to investigate and discipline Officer Hill for the crimes he has committed.  DOC officials have never adequately responded to her requests.

123.   On October 26, 2005, after repeated requests for this information, the DOC stated that Officer Hill is assigned to a post where he does not have access to firearms, but the DOC did not confirm the location of that post or indicate whether Officer Hill was ever in other environments (*e.g.*, while transporting inmates or spending time in "control rooms") where he might have access to firearms.  The DOC refused to provide Officer Henderson any additional information and instead responded that "the DOC does not have a procedure for assistance with safety planning."

124.   In August 2005, Officer Henderson and her attorney met with Albert Ceva and Joe Vaca of the DOC Trials and Litigation Division.  Officer Henderson and her attorney explained to the DOC attorneys that Officer Hill had pled guilty to misdemeanor assault and criminal contempt, that he had been stalking and harassing Officer Henderson ever since, and that Officer Henderson feared for her personal safety.  Officer Henderson asked for information concerning Officer Hill's employment status, whereabouts, schedule, ability to access firearms, and other related information.

125.   Mr. Ceva, a prosecutor at the DOC Trials and Litigation Division, informed Officer Henderson that he was unaware of any disciplinary measures taken by the DOC against Officer Hill and could not explain why, after the domestic assault, the DOC had not followed its own policies concerning the investigation and discipline of officers arrested for domestic violence crimes.

126.   Mr. Vaca and Mr. Ceva also told Officer Henderson that according to DOC policy, when an inmate threatens a correction officer, the DOC issues that correction officer a personal protection gun, bulletproof vest and city-wide radio for

- 30 -

increased safety.  Mr. Ceva and Mr. Vaca recommended that Officer Henderson request these personal protection items from the DOC.  On September 19, 2005, Officer Henderson, through her attorneys, requested that the DOC immediately issue her a bulletproof vest and city-wide radio as reasonable accommodations to allow her to perform her job safely.

127.    On October 26, 2005, the DOC denied Officer Henderson's request, stating in a letter that the "DOC does not issue a . . . bulletproof vest . . . and city-wide radio to staff members who are allegedly threatened by another staff member."

128.    Also at this meeting, Mr. Ceva and Mr. Vaca informed Officer Henderson that they would be "prosecuting" Officer Hill in an administrative "trial" before a DOC-appointed judge.

129.    The date for this trial has been set for July 24, 2006.

130.    On April 25, 2006, at a meeting with Mr. Ceva and William Bryk, another DOC prosecutor in the Trials and Litigation Division, Officer Henderson repeated her request for information pertaining to Officer Hill's schedule, employment status, and employment placement and again asked whether, to the DOC's knowledge, Officer Hill had access to firearms and had been required to undergo a DOC psychological evaluation after the assault.  Officer Henderson emphasized that for the period of time during which he lived at her house, Officer Hill carried two off-duty personal firearms.  Officer Henderson told Mr. Ceva and Mr. Bryk that on the night Officer Hill was arrested for domestic violence, his two personal firearms were lying on the nightstand beside the bed.

131.    Mr. Bryk noted that correction officers are required to keep personal firearms locked up when these firearms are within private homes, and that Officer Hill

had violated departmental policy by failing to lock up these weapons while at home.  Mr.
Ceva and Mr. Bryk also noted that Officer Hill's failure to follow DOC policy here was
particularly disturbing, given that the weapons were lying next to him as he committed a
violent crime.  Even though Mr. Ceva and Mr. Bryk acknowledged that Officer Hill's
behavior was in flagrant violation of DOC policy, Officer Hill has, upon information and
belief, never been disciplined by the DOC for this violation of DOC policy.

132.     To this date, Officer Henderson has still not received adequate information
as to (a) steps taken by the DOC, in accordance with DOC policy, to investigate and/or
punish Officer Hill for the crimes he committed against Officer Henderson, or (b) Officer
Hill's schedule, employment status, or access to firearms, even though she has repeatedly
emphasized to the DOC that such information is important for her personal safety.

133.     Due in part to the DOC's inadequate response to her requests, Officer
Henderson has installed a new security system in her home, changed her phone number,
and carries a "911 panic button" with her at all times to prevent and protect herself from
future attacks by Officer Hill.

*The DOC's Continued Discriminatory Treatment of Officer Henderson*

134.     Upon preparing to return to work on June 6, 2005, after the domestic
assault, Officer Henderson requested placement in an administrative position, because
(a) she would be least likely to encounter her abuser, Officer Hill, in such a position, and
(b) such jobs are considerably less stressful than work in the jails, and would therefore be
a more conducive environment for Officer Henderson's recuperation from her domestic
violence-related injuries.  Her request was denied.

135.     Instead, she was placed in a job and location that was less desirable than her previous post at the Bellevue facility.  In contrast to the Bellevue facility, which was clean and well-maintained, the facility at which Officer Henderson is currently stationed is dirty, not well-ventilated, under construction, and located in a cold area of an old, dreary building.

136.     On information and belief, Officer Hill has been transferred to a "preferred facility," the Brooklyn House of Detention.  This is considered a desirable position for correction officers – indeed, correction officers call it a "retirement home" – because it is a low-stress, pleasant atmosphere where correction officers with senior status and connections to high-powered administrators are often assigned.  Prior to his assault on Officer Henderson, Officer Hill had repeatedly expressed to her that he greatly desired to work at this facility.

137.     Although the DOC has permitted Officer Henderson to return to work, HMD continues to designate her as "psychologically unfit for duty."  Due to this designation, the DOC has refused to permit Officer Henderson to take the necessary steps toward qualifying for the DOC firearms test.

138.     In contrast, upon information and belief, the DOC has not designated Officer Hill as "psychologically unfit for duty."  The DOC has refused to provide Officer Henderson with information concerning whether Officer Hill is currently permitted to carry a DOC-issued firearm.

139.     In her nearly sixteen years as a correction officer at the DOC, Officer Henderson has never been treated so harshly by the DOC as she has been in the period following her report to the DOC of Officer Hill's domestic violence-related crimes.  The

DOC's behavior and threats of discipline against Officer Henderson have been baseless, unduly harsh, discriminatory, and retaliatory.

**C.    Facts Pertaining to Plaintiffs Simmonds and Henderson**

140.    Upon information and belief, the severity of the discipline and threatened discipline to which the DOC Defendants have subjected Plaintiffs is generally reserved for employees who commit grave infractions and misconduct.

141.    Upon information and belief, other female correction officers at the DOC who were also known to be victims of sexual assault and other gender-motivated crimes have also been subjected to threats and punishments similar to those that Plaintiffs received.

142.    In the United States and in New York City, the vast majority of victims of sexual assault, domestic violence, and stalking are women.

143.    Upon information and belief, the DOC has not conducted an adequate investigation into the crimes of violence committed by Plaintiffs' attackers, Officers Hall and Hill, in violation of its own policies.

144.    Upon information and belief, the DOC has not adequately disciplined Plaintiffs' attackers, Officers Hall and Hill, in violation of its own policies.

145.    Upon information and belief, Plaintiffs and other female correction officers who are victims of sexual assault, domestic violence, stalking, or other gender-motivated crimes committed by male correction officers are more harshly disciplined by the DOC than are the male perpetrators of the violence.

146.    As a result of the DOC Defendants' actions, Plaintiffs experienced great emotional and psychological distress.

147.    From approximately October 2005 to the present, Officer Simmonds has had persistent feelings of anxiety, loss, hopelessness, and depression.  Officer Simmonds

cries often and has experienced sleeplessness and the inability to concentrate. She often

suffers from severe migraine headaches that she attributes, in large part, to the stress of

the DOC's discrimination, retaliation, and refusal to provide reasonable accommodations

since October 2005.

148.    From approximately March 2005 to the present, Officer Henderson has

had persistent feelings of anxiety, loss, and hopelessness that she attributes in large part

to DOC's discrimination, retaliation, and refusal to provide reasonable accommodations.

Officer Henderson cries often and has experienced sleeplessness, depression, and the

inability to concentrate. Although she used to enjoy her job as a correction officer, she

now dreads going into work because she feels ostracized and alienated by the DOC.

149.    Plaintiffs' requests to the DOC for reasonable accommodations to enable

them, as victims of sexual assault, domestic violence, stalking, and/or other gender-

motivated violence, to satisfy the essential requisites of their jobs would have imposed no

undue hardship on the DOC Defendants. Yet the DOC refuses to provide Plaintiffs with

these accommodations, even though such accomodations are guaranteed by law to

Plaintiffs and those similarly situated.

150.    The DOC Defendants harassed, berated, and mistreated Plaintiffs based on

their sex and based on their status as victims of sexual assault and domestic violence. In

addition, the DOC has retaliated against Plaintiffs because they asserted their rights under

federal, state, and local civil rights law and under DOC policy. In treating Plaintiffs in

this manner, Defendants violated federal, state, and city law.

## FIRST CAUSE OF ACTION
Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e-2(a)
(Against the DOC Defendants)

151.    Plaintiffs repeat and incorporate by reference all of the allegations

contained in the preceding paragraphs of this complaint.

152.    By detrimentally altering the terms, conditions, and/or privileges of

Plaintiffs' employment, while never adequately investigating the assaults of Plaintiffs or

disciplining the men who assaulted Plaintiffs as required by DOC policy, the DOC

Defendants intentionally discriminated against Plaintiffs on the basis of sex, in violation

of Title VII, 42 U.S.C. § 2000e-2(a).

153.    The DOC Defendants engaged in such discriminatory conduct

intentionally, willfully, and in disregard of the rights of Plaintiffs.

154.    As a result of the DOC Defendants' unlawful discriminatory practices,

Plaintiffs have suffered damages and injury.

## SECOND CAUSE OF ACTION
Sexual Harassment in Violation of Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e-2(a)
(Against the DOC Defendants)

155.    Plaintiffs repeat and incorporate by reference all of the allegations

contained in the preceding paragraphs of this complaint.

156.    By sexually harassing Officer Simmonds and creating a hostile work

environment, the DOC Defendants intentionally discriminated against Officer Simmonds

on the basis of her sex, in violation of Title VII, 42 U.S.C. § 2000e-2(a).

157.    The DOC Defendants engaged in such discriminatory conduct

intentionally, willfully, and in disregard of the rights of Officer Simmonds.

158.   As a result of the DOC Defendants' unlawful discriminatory practices, Officer Simmonds suffered damages and injury.

### THIRD CAUSE OF ACTION
Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e-2(a)
(Against the DOC Defendants)

159. .   Plaintiffs repeat and incorporate by reference all of the allegations contained in the preceding paragraphs of this complaint.

160.   By engaging in a policy, pattern, and/or practice of: (1) failing to enforce DOC policies related to domestic violence, sexual assault, stalking, or other gender-motivated conduct that is "unbecoming of a correction officer," as defined in DOC policies, and (2) punishing victims of gender-motivated violence who report that violence to the DOC and request that the DOC take appropriate action to discipline perpetrators and protect victims of such violence, the DOC Defendants have engaged in practices that have a disparate impact on women and therefore discriminate on the basis of sex, in violation of Title VII, 42 U.S.C. § 2000e-2(a).

161.   The DOC Defendants engaged in such discriminatory conduct intentionally, willfully, and in disregard of the rights of Plaintiffs.

162.   As a result of the DOC Defendants' unlawful discriminatory practices, Plaintiffs have suffered damages and injury.

### FOURTH CAUSE OF ACTION
Retaliation in Violation of Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e-3(a)
(Against the DOC Defendants)

163.   Plaintiffs repeat and incorporate by reference all of the allegations contained in the preceding paragraphs of this complaint.

164.    By disciplining Plaintiffs and otherwise discriminating against them when Plaintiffs complained of gender-motivated assaults by their male coworkers and complained of the DOC's treatment of Plaintiffs compared to the DOC's treatment of Plaintiffs' assailants, the DOC Defendants unlawfully retaliated against Plaintiffs for asserting their rights to be free from sex discrimination, in violation of Title VII, 42 U.S.C. § 2000e-3(a).

165.    The DOC Defendants engaged in such discriminatory conduct intentionally, willfully, and in disregard of the rights of Plaintiffs.

166.    As a result of the DOC Defendants' retaliation, Plaintiffs have suffered damages and injury.

### FIFTH CAUSE OF ACTION
Sex Discrimination in Violation of New York State Human Rights Law,
McKinney's Exec. Law § 290 *et seq.*
(Against the DOC Defendants)

167.    Plaintiffs repeat and incorporate by reference all of the allegations contained in the preceding paragraphs of this complaint.

168.    By detrimentally altering the terms, conditions, and/or privileges of Plaintiffs' employment, while never adequately investigating the assaults of Plaintiffs or disciplining the men who assaulted Plaintiffs as required by DOC policy, the DOC Defendants intentionally discriminated against Plaintiffs on the basis of sex, in violation of New York State Human Rights Law, McKinney's Exec. Law § 290 *et seq.*

169.    The DOC Defendants engaged in such discriminatory conduct intentionally, willfully, and in disregard of the rights of Plaintiffs.

170.    As a result of the DOC Defendants' unlawful discriminatory practices, Plaintiffs have suffered damages and injury.

**SIXTH CAUSE OF ACTION**
Sexual Harassment in Violation of New York State Human Rights Law,
McKinney's Exec. Law § 290 *et seq.*
(Against the DOC Defendants)

171.    Plaintiffs repeat and incorporate by reference all of the allegations contained in the preceding paragraphs of this complaint.

172.    By sexually harassing Officer Simmonds and creating a hostile work environment, the DOC Defendants intentionally discriminated against Officer Simmonds on the basis of her sex, in violation of New York State Human Rights Law, McKinney's Exec. Law § 290 *et seq.*

173.    The DOC Defendants engaged in such discriminatory conduct intentionally, willfully, and in disregard of the rights of Officer Simmonds.

174.    As a result of the DOC Defendants' unlawful discriminatory practices, Officer Simmonds suffered damages and injury.

**SEVENTH CAUSE OF ACTION**
Sex Discrimination in Violation of New York State Human Rights Law,
McKinney's Exec. Law § 290 *et seq.*
(Against the DOC Defendants)

175.    Plaintiffs repeat and incorporate by reference all of the allegations contained in the preceding paragraphs of this complaint.

176.    By engaging in a policy, pattern, and/or practice of: (1) failing to enforce DOC policies related to domestic violence, sexual assault, stalking, or other gender-motivated conduct that is "unbecoming of a correction officer," as defined in DOC policies, and (2) punishing victims of gender-motivated violence who report that violence to the DOC and request that the DOC take appropriate action to discipline perpetrators and protect victims of such violence, the DOC Defendants have engaged in practices that

- 40 -

have a disparate impact on women and therefore discriminate on the basis of sex, in

violation of New York State Human Rights Law, McKinney's Exec. Law § 290 *et seq.*

177.    The DOC Defendants engaged in such discriminatory conduct

intentionally, willfully, and in disregard of the rights of Plaintiffs.

178.    As a result of the DOC Defendants' unlawful discriminatory practices,

Plaintiffs have suffered damages and injury.

### EIGHTH CAUSE OF ACTION
Retaliation in Violation of New York State Human Rights Law,
McKinney's Exec. Law § 290 *et seq.*
(Against the DOC Defendants)

179.    Plaintiffs repeat and incorporate by reference all of the allegations

contained in the preceding paragraphs of this complaint.

180.    By disciplining Plaintiffs and otherwise discriminating against them when

Plaintiffs complained of gender-motivated assaults by their male coworkers and of the

DOC's treatment of Plaintiffs compared to the DOC's treatment of Plaintiffs' assailants,

the DOC Defendants unlawfully retaliated against Plaintiffs for asserting their rights to be

free from sex discrimination, in violation of Title VII, 42 U.S.C. § 2000e-3(a).

181.    The DOC Defendants engaged in such discriminatory conduct

intentionally, willfully, and in disregard of the rights of Plaintiffs.

182.    As a result of the DOC Defendants' retaliation, Plaintiffs have suffered

damages and injury.

## NINTH CAUSE OF ACTION
Gender Discrimination in Violation of New York City Human Rights Law,
N.Y.C. Admin. Code § 8-107(1)
(Against the DOC Defendants)

183. Plaintiffs repeat and incorporate by reference all of the allegations contained in the preceding paragraphs of this complaint.

184. By detrimentally altering the terms, conditions, and/or privileges of Plaintiffs' employment, while never adequately investigating the assaults of Plaintiffs or disciplining the men who assaulted Plaintiffs as required by DOC policy, the DOC Defendants intentionally discriminated against Plaintiffs on the basis of sex, in violation of New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1).

185. The DOC Defendants engaged in such discriminatory conduct intentionally, willfully, and in disregard of the rights of Plaintiffs.

186. As a result of the DOC Defendants' unlawful discriminatory practices, Plaintiffs have suffered damages and injury.

## TENTH CAUSE OF ACTION
Sexual Harassment in Violation of New York City Human Rights Law,
N.Y.C. Admin. Code § 8-107(1)
(Against all Defendants)

187. Plaintiffs repeat and incorporate by reference all of the allegations contained in the preceding paragraphs of this complaint.

188. By sexually harassing Officer Simmonds and creating a hostile work environment, the DOC Defendants intentionally discriminated against Officer Simmonds on the basis of her sex, in violation of New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1).

189.    By sexually harassing Officer Simmonds and creating a hostile work environment, Officer Hall intentionally discriminated against Officer Simmonds on the basis of her sex, in violation of New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1).

190.    Defendants engaged in such discriminatory conduct intentionally, willfully, and in disregard of the rights of Officer Simmonds.

191.    As a result of the Defendants' unlawful discriminatory practices, Officer Simmonds suffered damages and injury.

**ELEVENTH CAUSE OF ACTION**
Sex Discrimination in Violation of New York City Human Rights Law,
N.Y.C. Admin. Code § 8-107(1)
(Against the DOC Defendants)

192.    Plaintiffs repeat and incorporate by reference all of the allegations contained in the preceding paragraphs of this complaint.

193.    By engaging in a policy, pattern, and/or practice of: (1) failing to enforce DOC policies related to domestic violence, sexual assault, stalking, or other gender-motivated conduct that is "unbecoming of a correction officer," as defined in DOC policies, and (2) punishing victims of gender-motivated violence who report that violence to the DOC and request that the DOC take appropriate action to discipline perpetrators and protect victims of such violence, the DOC Defendants have engaged in practices that have a disparate impact on women and therefore discriminate on the basis of sex, in violation of New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1).

194.    The DOC Defendants engaged in such discriminatory conduct intentionally, willfully, and in disregard of the rights of Plaintiffs.

195.    As a result of the DOC Defendants' unlawful discriminatory practices, Plaintiffs have suffered damages and injury.

## TWELFTH CAUSE OF ACTION
### Unlawful Retaliation in Violation of New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 et seq.
### (Against the DOC Defendants)

196.    Plaintiffs repeat and incorporate by reference all of the allegations contained in the preceding paragraphs of this complaint.

197.    By disciplining Plaintiffs and otherwise discriminating against them when Plaintiffs complained of gender-motivated assaults by their male coworkers and complained of the DOC's treatment of Plaintiffs compared to the DOC's treatment of Plaintiffs' assailants, the DOC Defendants unlawfully retaliated against Plaintiffs for asserting their rights to be free from gender discrimination, in violation of New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 et seq.

198.    The DOC Defendants engaged in such discriminatory conduct willfully, intentionally, and in disregard of Plaintiffs' right to be free from discrimination.

199.    As a result of the DOC Defendants' unlawful discriminatory practices, Plaintiffs have suffered damages and injury.

## THIRTEENTH CAUSE OF ACTION
### Unlawful Discrimination Against Victims of Domestic Violence, Sexual Assault, and Stalking, in Violation of New York City Human Rights Law, N.Y.C. Admin. Code § 8-107.1(2)
### (Against the DOC Defendants)

200.    Plaintiffs repeat and incorporate by reference all of the allegations contained in the preceding paragraphs of this complaint.

201.    By detrimentally altering the terms, conditions, or privileges of Plaintiffs' employment upon learning that Officer Simmonds had been the victim of a sexual assault

- 44 -

and that Officer Henderson had been the victim of domestic violence and stalking, and by never adequately investigating the assaults of Plaintiffs or disciplining the men who assaulted Plaintiffs, as required by DOC policy, the DOC Defendants have discriminated against Officer Simmonds based on her status as a victim of sex offenses and Officer Henderson based on her status as a victim of domestic violence and stalking, in violation of N.Y.C. Admin. Code § 8-107.1(2).

202.    The DOC Defendants engaged in such discriminatory conduct willfully, intentionally, and in disregard of Plaintiffs' right to be free from discrimination.

203.    As a result of the DOC Defendants' unlawful discriminatory practices, Plaintiffs have suffered damages and injury, including emotional distress.

## FOURTEENTH CAUSE OF ACTION
Failure to Provide Reasonable Accommodations in Violation of New York City Human Rights Law, N.Y.C. Admin. Code § 8-107.1(3)(a)
(Against the DOC Defendants)

204.    Plaintiffs repeat and incorporate by reference all of the allegations contained in the preceding paragraphs of this complaint.

205.    By failing to make reasonable accommodations to Plaintiffs that would have enabled Plaintiffs to satisfy the essential requisites of their jobs as victims of sexual assault, domestic violence, and stalking, despite the DOC Defendants' knowledge of Plaintiffs' status as victims of sexual assault, domestic violence, and stalking, the DOC Defendants have violated New York City Administrative Code § 8-107.1(3)(a).  These reasonable accommodations include, but are not limited to: (a) providing Officer Simmonds with information as to where Officer Hall is stationed; what Officer Hall's current schedule is; what steps the DOC has taken to investigate Officer Hall's sexual assault of Officer Simmonds; and what discipline, if any, Officer Hall has incurred as a

result of the sexual assault; (b) permitting Officer Simmonds to take leave to recover

from the assault without incurring chronic absent status or other penalties or discipline

related to her absence from work; (c) permitting Officer Henderson to leave her home

while on medical leave to consult with the district attorney as to the criminal case against

Officer Hill; (d) placing Officer Henderson in an administrative job at the DOC, where

she is least likely to encounter her abuser, Officer Hill, and where she can most easily

heal from her serious physical injuries; (e) immediately issuing Officer Henderson a

bulletproof vest and city-wide radio for her on-the-job safety; and (f) providing Officer

Henderson with information as to where Officer Hill is stationed; what Officer Hill's

current schedule is; what steps the DOC has taken to investigate Officer Hill's acts of

domestic violence and stalking against Officer Henderson; what discipline, if any, Officer

Hill has incurred as a result of his violent and unlawful acts; whether Officer Hill has

undergone any DOC psychological evaluations; and what access, if any, Officer Hill has

to firearms.

206.    The DOC Defendants engaged in such discriminatory conduct willfully,

intentionally, and in disregard of Plaintiffs' right to be free from discrimination.

207.    As a result of the DOC Defendants' illegal conduct, Plaintiffs have

suffered damages and injury.

**FIFTEENTH CAUSE OF ACTION**
Unlawful Retaliation in Violation of New York City Human Rights Law,
N.Y.C. Admin. Code § 8-107 *et seq.*
(Against the DOC Defendants)

208.    Plaintiffs repeat and incorporate by reference all of the allegations

contained in the preceding paragraphs of this complaint.

209.    By disciplining Plaintiffs and otherwise discriminating against them when Plaintiffs (a) objected to the DOC Defendants' punitive actions toward them as victims of sexual assault, domestic violence, and stalking; (b) requested that the DOC Defendants take action against their assailants as required by DOC policy; and (c) requested reasonable accommodations to allow Plaintiffs to satisfy the essential requisites of their jobs, the DOC Defendants unlawfully retaliated against Plaintiffs for asserting their rights to be free from discrimination on the basis of their status as victims of sexual assault, domestic violence, and stalking, in violation of New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.*

210.    The DOC Defendants engaged in such discriminatory conduct willfully, intentionally, and in disregard of Plaintiffs' right to be free from discrimination.

211.    As a result of the DOC Defendants' illegal conduct, Plaintiffs have suffered damages and injury.

### SIXTEENTH CAUSE OF ACTION
Intentional Infliction of Emotional Distress
(Against all Defendants)

212.    Plaintiffs repeat and incorporate by reference all of the allegations contained in the preceding paragraphs of this complaint.

213.    The DOC Defendants' conduct in punishing Plaintiffs for being the victims of sexual assault and domestic violence while leveling no punishment against their assailants was extreme, outrageous, and egregious.

214.    Officer Hall's conduct in sexually harassing and assaulting Officer Simmonds on DOC premises and creating a hostile work environment was extreme, outrageous, and egregious.

215.   Defendants acted intentionally and willfully to cause Plaintiffs extreme emotional harm.

216.   As a result of Defendants' actions, Plaintiffs have suffered extreme emotional distress and injury.

## SEVENTEENTH CAUSE OF ACTION
### Negligent Hiring, Retention, Supervision
### (Against the DOC Defendants)

217.   Plaintiffs repeat and incorporate by reference all of the allegations contained in the preceding paragraphs of this complaint.

218.   The actions of the DOC Defendants, as alleged herein, constitute negligent hiring, retention, and supervision under the laws of the State of New York.

219.   As a result of the DOC Defendants' negligence, Plaintiffs have suffered damages, physical injury, and emotional distress.

## EIGHTEENTH CAUSE OF ACTION
### Commission of a Crime of Gender-Motivated Violence in Violation of New York City
### Victims of Gender-Motivated Violence Protection Act,
### N.Y.C. Admin. Code § 8-903, *et seq.*
### (Against Defendant Hall)

220.   Plaintiffs repeat and incorporate by reference all of the allegations contained in the preceding paragraphs of this complaint.

221.   Officer Hall committed a crime of violence motivated by gender as contemplated by N.Y.C. Admin. Code § 8-903, *et seq*, and thereby injured Officer Simmonds.

222.   As a result of Officer Hall's illegal conduct, Officer Simmonds has suffered damages and injury.

## NINETEENTH CAUSE OF ACTION
Commission of a Crime of Gender-Motivated Violence in Violation of New York City
Victims of Gender-Motivated Violence Protection Act,
N.Y.C. Admin. Code § 8-903, *et seq.*
(Against the DOC Defendants)

223.    Plaintiffs repeat and incorporate by reference all of the allegations

contained in the preceding paragraphs of this complaint.

224.    Officer Hall committed a crime of violence motivated by gender as

contemplated by N.Y.C. Admin. Code § 8-903, *et seq*, and thereby injured Officer

Simmonds.

225.    The DOC Defendants are vicariously liable to Plaintiff Simmonds for the

unlawful acts of gender-motivated violence committed by Officer Hall in the scope of his

employment.

226.    As a result of the DOC Defendants' illegal conduct, Officer Simmonds has

suffered damages and injury.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs request that this Court enter judgment:

(a)    Declaring that Defendants violated Plaintiffs' statutory rights as set out in

the causes of action;

(b)    Ordering such equitable and injunctive relief as necessary to restore

Plaintiffs to the terms, conditions, and privileges of employment they enjoyed

prior to the assaults;

(c)    Ordering such injunctive relief as necessary to prevent Defendants and

their officers, employees, agents, successors, and those acting in concert with

them from any conduct violating Plaintiffs' rights as set out in the causes of

action, or the rights of those similarly situated;

(d)    Awarding Plaintiffs all damages to which they are entitled as a result of

Defendants' unlawful conduct, including compensatory and punitive damages and

damages for emotional distress, in an amount to be determined at trial;

(e)    Awarding Plaintiffs reasonable attorneys' fees and costs incurred in this

action; and

(f)    Granting Plaintiffs such other and further relief as this Court may deem

just and proper.

## DEMAND FOR JURY

Plaintiffs demand a trial by jury on each and every claim to which they are

entitled.


Dated:  New York, New York
       July 13, 2006

                Respectfully Submitted,


                By: _Caroline Bettinger-Lopez_
                Caroline Bettinger-Lopez, Esq. (CB-4834)
                Emily J. Martin, Esq. (EM-2924)
                Lenora M. Lapidus, Esq. (LL-6592)
                AMERICAN CIVIL LIBERTIES UNION FOUNDATION –
                WOMEN'S RIGHTS PROJECT
                125 Broad Street, 18th Floor
                New York, NY  10004
                (212) 519-7819  phone
                (212) 549-2580  fax


                - and -


                STEPTOE & JOHNSON LLP
                John D.  Lovi, Esq. (JL-5928)
                Michael Rips, Esq.
                Lara E. Romansic, Esq.
                Marcia Yablon, Esq. (MY-2000)
                750 Seventh Avenue
                New York, New York  10019
                (212) 506-3910  phone
                (212) 506-3950  fax


                *Attorneys for Plaintiffs*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

DANIELLE H. SIMMONDS and
SONYA HENDERSON,

                Plaintiffs

– against –

THE NEW YORK CITY DEPARTMENT OF
CORRECTION; MARTIN F. HORN, *as
Commissioner of the New York City Department
of Correction;* and SHAUN HALL, *individually,*

                Defendants.

Index No.:

## AFFIDAVIT OF SERVICE

State of New York    )
                    ) ss.:
County of New York)  )

      Robert Ajiashvili, being duly sworn, deposes and says:

      1.    I am over the age of eighteen (18) years and am not a party to this action.  I reside

in New York, New York.

      2.    On July 13, 2006, I served a true and correct copy of Complaint, upon the parties

listed below by hand:

Patricia L. Gatling
Commissioner
Human Rights Commission
40 Rector Street, 10th Floor
New York, NY 10006
(212) 306-5070

Michael Cardozo
Corporation Counsel
100 Church Street
New York, NY 10007
(212) 788-0303

Robert Ajiashvili

Sworn to before me on July 13, 2006

Notary Public

LARA E. ROMANSIC
Notary Public, State of New York
No. 02RO6088797
Qualified in New York County
Commission Expires 03/17/2007