```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-16-08
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
DANIELLE H. SIMMONDS and SONYA
HENDERSON,

                        Plaintiffs,

            v.

NEW YORK CITY DEPARTMENT OF
CORRECTIONS, MARTIN F. HORN, and
SEAN HALL,

                        Defendants.
----------------------------------X

**MEMORANDUM AND ORDER**

06 Civ. 5298 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Danielle H. Simmonds ("Simmonds") and Sonya Henderson ("Henderson") brought this action against the New York City Department of Corrections, Martin F. Horn ("the City defendants"), and Sean Hall ("Hall"), alleging statutory claims of gender discrimination, sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964 and New York state and New York City human rights laws, as well as common law claims of intentional infliction of emotional distress and negligent hiring, retention and supervision.[1]  The procedural history of the case is rather uneventful.  The action was commenced on July 13, 2006, at which time the plaintiffs were jointly represented

---

[1]     The following facts have been drawn from the Amended Complaint and Jury Demand ("Compl."), the declarations of Lenora M. Lapidus ("Lapidus Decl." and "Lapidus Supp. Decl."), John D. Lovi ("Lovi Decl."), and Justin M. Swartz ("Swartz Decl.") in support of Simmonds's motion, and the declaration of Blanche Greenfield in opposition to the motion ("Greenfield Decl.").

by the Women's Rights Project ("WRP") of the American Civil Liberties Union ("ACLU")[2] and Steptoe & Johnson, LLP ("Steptoe")[3]. At the initial pre-trial conference on December 15, 2006, the Court questioned the joinder of the plaintiffs in the same action given the distinct factual bases for their claims. Shortly thereafter, Leeds Morelli & Brown, PC was substituted as counsel for Henderson. During the four-month period of joint representation, the ACLU and Steptoe served the plaintiffs' initial disclosures and began drafting their first set of interrogatories and document requests. Following the substitution, the parties negotiated a protective order and conducted document discovery for approximately five months. On July 20, 2007, before any depositions had been taken and without any dispositive or discovery motions being filed, Simmonds accepted the City defendants' offer of judgment in the amount of

---

2

The ACLU WRP attorneys include: Lenora M. Lapidus ("Lapidus"), the Director of the ACLU WRP and a 1990 graduate of Harvard Law School; Emily Martin ("Martin"), the Deputy Director of the ACLU WRP and a 1998 graduate of Yale Law School; Caroline Bettinger-Lopez ("Bettinger-Lopez"), a 2003 graduate of Columbia University School of Law; and Araceli Martinez-Olguin ("Martinez-Olguin"), a 2004 graduate of University of California, Berkeley School of Law. Martinez-Olguin was transitioned onto the matter in September 2006 to replace Bettinger-Lopez, whose fellowship at the ACLU WRP had recently concluded.

3

The Steptoe attorneys include: John D. Lovi ("Lovi"), a partner and 1986 graduate of Yale Law School; Lara E. Romansic ("Romansic"), a senior associate and 1999 graduate of Georgetown University Law Center; and Marcia A. Yablon ("Yablon"), a junior associate and 2004 graduate of Yale Law School. Yablon left Steptoe in May 2007, at which point Romansic assumed primary responsibility for the matter at Steptoe.

$95,001.[4]  As the prevailing party in the action, Simmonds now seeks attorney's fees from the City defendants in the amount of $233,120.36.[5] For the reasons stated herein, the motion is GRANTED in part.

## DISCUSSION

The Second Circuit has recently abandoned the use of the term "lodestar" and instructed the district courts to fashion an attorney fee award by first setting a "reasonable hourly rate," bearing in mind "all of the case-specific variables" that have been identified as relevant to the reasonableness of attorney's fees, and then using the hourly rate in combination with the number of hours reasonably expended to calculate a "presumptively reasonable fee." Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182, 189-90 (2d Cir. 2008); see also Porzig v. Dresdner, Kleinwort, Benson, North America LLC, 497 F.3d 133, 141 (2d Cir. 2007). A district court may exercise its discretion and use a percentage deduction "as a practical means of trimming fat from a fee application." Kirsch

---

4

       Simmonds has filed a motion for default judgment against Hall, who has not yet answered the complaint.

5

       Simmonds's motion also seeks compensation for costs in the amount of $2031.16. See Lovi Decl. ¶ 48; Lapidus Decl. ¶ 56. The City defendants objected to certain travel and meal expenses in the request and, in her reply papers, Simmonds conceded that these expenses were not proper. The balance of $1,551.28 shall be awarded.

<u>v. Fleet St., Ltd.</u>, 148 F.3d 149, 173 (2d Cir. 1998) (citation and quotation marks omitted).

The City defendants have challenged the reasonableness of the requested rates and the total number of hours expended over the course of the litigation, which are as follows:

**Motion for Attorney's Fees and Costs**

| Staff | Firm | Role | Hours Expended | Rate ($) | Request($) |
|-------|------|------|----------------|----------|------------|
| Lapidus | ACLU | Director | 2.26 | 600 | 1,353.17 |
| Martinez-Olguin | ACLU | Jr. Atty | 38.2 | 325 | 12,419.23 |
| Reigel | ACLU | Paralegal | 24.35 | 140 | 3,408.76 |

**Litigation Through Settlement**

| Staff | Firm | Role | Hours Expended | Rate ($) | Request($) |
|-------|------|------|----------------|----------|------------|
| Lapidus | ACLU | Director | 11.89 | 600 | 7,134 |
| Martin | ACLU | Deputy Director | 40.41 | 500 | 20,205 |
| Bettinger-Lopez[6] | ACLU | Jr. Atty | 99.02 | 350 | 34,657 |
| Martinez-Olguin | ACLU | Jr. Atty | 124.96 | 325 | 44,843.5 |
| Reigel | ACLU | Paralegal | 8.58 | 140 | 1,201.2 |

---

6
     Simmonds is claiming attorney's fees for Bettinger-Lopez, whose salary was being paid by the Skadden Fellowship Foundation and not the ACLU. Since the City defendants have not raised the issue of whether Bettinger-Lopez's time is compensable, we will treat the request as we would any other fee request, trusting that the ACLU will adhere strictly to its ethical and professional responsibilities in administering any fee award for Bettinger-Lopez's work in this matter.

| Lovi | Steptoe | Partner | 39.25 | 650 | 25,512.5 |
|------|---------|---------|-------|-----|----------|
| Romansic | Steptoe | Sr. Atty | 54.4 | 485 | 26,384 |
| Yablon | Steptoe | Jr. Atty | 142.4 | 380 | 54,112 |
| Ajashvilli | Steptoe | Paralegal | 13.5 | 140 | 1,890 |

**Total Attorney Hours:** 552.79
**Total Paralegal Hours:** 46.53
**Total Request:** $233,120.36

Although the City defendants have raised a number of specific arguments against awarding the full amount of Simmonds's fee request, the essence of their challenge is directed to the propriety of compensating Simmonds for the co-counsel arrangement between the ACLU and Steptoe. The ACLU-Steptoe partnership represents one application of a successful model of public interest litigation in which fees and costs are distributed between a non-profit, public interest law firm and a private law firm in the event that the plaintiff does not prevail. Often times, as in this case, the subject matter of the litigation lies outside the core competency and practice area of the attorneys at the private law firm. The model succeeds, in part, because both firms derive secondary benefits from their participation in the litigation. The non-profit firm is driven by the desire to further its organizational mission. The private law firm is able to train junior attorneys in aspects of trial and motion practice that are often unavailable to them with the firm's traditional clients and to accrue reputational benefits from being associated

-5-

with the particular case or from demonstrating a general commitment to pro bono work.[7]

We have no intention of upsetting the incentive structure that facilitates the existence of this formidable and beneficial partnership between private and public interest law firms, and we appreciate that plaintiffs are always entitled to the most effective representation that becomes available to them. However, it is important, at the outset, to restate the fundamental principle that the attorney's fees and costs recoverable from defendants is, and always has been, bounded by reasonableness.   And, in this case, the reality is that any fee award is paid for by the taxpayers of the City of New York.   With these observations in mind, we turn to address the merits of Simmonds's motion.

## I.   Reasonable Rates

The City defendants contend that the rates requested by the ACLU and Steptoe are not reasonable because (i) the ACLU WRP does not have the overhead expenses of a large firm, and therefore, should be compensated at the prevailing rates in the small-firm market; (ii) counsel accepted the representation on a pro bono basis with the expectation of deriving significant non-pecuniary

---

7
   It is our experience that, in this context, many private law firms foreswear fees or donate any fees awarded to charity.   We have not been informed of Steptoe's intent in this regard.

benefits from their participation in the matter; and (iii) the case did not present novel or complex issues of law or fact. While we agree in principle with the City defendants' contention that the requested rates are inflated, their arguments overstate the case for the magnitude of the proposed rate reduction.

### A.    Small-Firm Market

Even if we were to accept the notion that the ACLU's overhead expenses are comparable to those of a small law firm,[8] we reject out of hand the City defendants' suggestion that the ACLU should be compensated at the prevailing rates of small civil rights law firms.

The Second Circuit has cautioned that "[o]verhead is not a valid reason for why certain attorneys should be awarded a higher or lower hourly rate." McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension, 450 F.3d 91, 97 n.6 (2d Cir. 2006) (citations and quotation marks omitted); see also Blum v. Stenson, 465 U.S. 886, 892, 895-96 (1984) (rejecting the Solicitor General's suggestion that fees awarded to non-profit legal aid societies be based on a "cost-related standard"). "The focus of the inquiry into the reasonable hourly rate must instead be determined by reference to prevailing rates in the community

---

8    Contra Lapidus Decl. ¶ 2 (noting that the ACLU's New York headquarters, also home to the WRP, is located in Manhattan's financial district and leased from Sullivan & Cromwell, LLP). Notably missing is any affirmation that the ACLU pays full market rate for its leased space.

for similar services by lawyers of reasonably comparable skill, expertise, and reputation." McDonald ex rel Prendergast, 450 F.3d at 97 n.6. In the course of determining the relevant market, the district court "*may* look to rates charged by those similarly situated," including the rates of firms that are comparably sized. Id. (emphasis in original); Chambless v. Masters, Mates & Pilots Pension Plan, 885 F.2d 1053, 1059 (2d Cir. 1989) ("[S]maller firms may be subject to their own prevailing market rate . . . .").

Regardless of whether we look to the size of the ACLU (or that of its New York office) or the skill, experience and reputation of the ACLU attorneys in this case, it is clear that the relevant market cannot be the small firm market. The WRP is not, as the City defendants suggest, a law firm unto itself but merely one practice group within the ACLU, the nation's largest public interest law firm. The ACLU's New York office employs approximately fifty full-time staff attorneys, including the WRP attorneys. Compare Saunders v. The Salvation Army, No. 06 Civ. 2980(SAS), 2007 WL 927529, at *3 (S.D.N.Y. Mar. 27, 2007) ("[T]he Center is comparable to a small law firm-it has employed one or two attorneys at most since its inception in 2003. Moreover, the Center does not pay rent for its office space which is donated by a law firm."); Tlacoapa v. Carregal, 386 F. Supp. 2d 362, 370 (S.D.N.Y. 2005) ("Plaintiff's attorneys are indisputably members of a small law firm, as it contains only three full-time

-8-

attorneys, two of counsel attorneys (in Texas and West Virginia) and three paralegals."). Moreover, we are confident that the City defendants are well aware of the ACLU's deep, historical commitment to civil liberties litigation and of their reputation for excellence in that realm.

### B.   Non-Profit and Pro Bono Representation

We are also unpersuaded by the City defendants' argument that the ACLU and Steptoe should be compensated at drastically reduced rates (if at all) because they acted as pro bono counsel to Simmonds and expected to derive secondary benefits from the representation.

The City defendants' challenge is premised on the Second Circuit's recent decision in Arbor Hill, which listed a series of factors for the district courts to consider in setting a reasonable rate, and included among the relevant factors:

> whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted pro bono (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation.

Arbor Hill, 522 F.3d at 184.  This language cannot support the City defendants' position because the Second Circuit immediately added that attorneys engaged in pro bono or reduced-fee work are not "excluded from the usual approach to determining attorneys'

-9-

fees." <u>Id.</u> at 184 n.2; <u>see</u> <u>also</u> <u>Blum v. Stenson</u>, 465 U.S. 886, 894 (1984); <u>Reiter v. MTA N.Y. City Transit Auth.</u>, 457 F.3d 224, 233 (2d Cir. 2006). The gravamen of a reasonable rate remains the market rate that a reasonable client would expect to pay given "the nature of the representation and type of work involved in a case." <u>Arbor Hill</u>, 522 F.3d at 184 n.2. Thus, <u>Arbor Hill</u> merely directs the district courts to examine all of the case-specific factors relevant to evaluating the market rate for comparable legal services. <u>See, e.g.</u>, <u>Heng Chan v. Sung Yue Tung Corp.</u>, No. 03 Civ. 6048(GEL), 2007 WL 1373118, at *2–*3 (S.D.N.Y. May 8, 2007); <u>Wise v. Kelly</u>, No. 05 Civ. 5442(SAS)(THK), 2008 WL 482399, at *9 (S.D.N.Y. Feb. 21, 2008). Of course, to the extent that the market rate for such services is lower than the rate ordinarily charged by the plaintiff's attorney, extrinsic motives for participating in the matter may explain why he or she would accept the representation knowing full well that, should the plaintiff prevail, compensation will be had at the former, and not the latter, rate. <u>See</u> <u>Arbor Hill</u>, 522 F.3d at 190 ("The district court should also consider that such an individual might be able to negotiate with his or her attorneys . . . ."). But a single attorney's motives for participating in the representation ordinarily will be irrelevant to determining the market rate itself, unless, of course, some aspect of the case renders those motives imputable to the market as a whole.

The ACLU obviously has an organizational mission that gives rise to an independent interest in achieving the ends of the representations it accepts. This fact does not necessarily compel a reduction in the requested rate, but rather, explains why the market rate for prosecuting a particular case may be less than that sought by the ACLU. As we note _infra_, the ordinary civil rights plaintiff would not tolerate a premium rate simply because the case presents a remote opportunity for setting legal precedent that resonates with the ACLU's mission. On the other hand, if a reasonably frugal client would be willing to pay the ACLU's requested rate _ex ante_, because the case presents novel legal questions or requires vast institutional resources, we see no reason why the ACLU should be penalized for being a non-profit legal services organization.

Likewise, Steptoe may "derive[] value from undertaking litigation such as this which may indeed far exceed anything the Court can award, such as training to younger associates and the recruitment value of a strong pro bono practice." _Betancourt v. Giuliani_, 325 F. Supp. 2d 330, 333 (S.D.N.Y. 2004) (quoting _Pastre v. Weber_, 800 F. Supp. 1120, 1125 (S.D.N.Y. 1991)). These incentives cannot justify reducing Steptoe's customary rates unless some aspect of the representation or the type of work involved would cause a reasonable plaintiff to decline those rates. In this case, the Steptoe attorneys acknowledge a lack familiarity with civil rights and employment discrimination

litigation and, therefore, a putative civil rights plaintiff would be unwilling to pay the rates charged to their corporate clients in commercial or other civil litigation. At a reduced billing rate, made possible because Steptoe derives secondary benefits from the representation, a reasonable paying client might readily retain the Steptoe attorneys as co-counsel to take advantage of their "expertise in federal litigation and trial practice."[9]

With these observations in mind, we turn to consider what a reasonable paying client in Simmonds's shoes would expect to pay for comparable civil rights litigation services.

### B.  The Scope and Complexity of the Litigation

We find that the instant action did not present any unusually complicated factual or legal issues that would merit the hourly rates sought by Simmonds. Counsel for Simmonds sought "to expand the forms of sex discrimination" cognizable under Title VII and New York state and city human rights laws and, therefore, asserted several alternative theories of liability that appear to be unprecedented. This is, of course, an admirable and worthy endeavor, but the costs of paving the way for future plaintiffs should not be borne by the City defendants in this case, which did not necessitate the presentment of any

---

9
    Simmonds's Reply in Support of the Motion for Attorney's Fees ("Reply") at 7.

novel legal questions. Though we cannot be certain because Simmonds was not paying for counsel's services, it appears that a reasonably thrifty client made aware of the adequacy of Simmonds's core claims would have opted for less costly representation.

The result would be no different even if we were to assume that the novelty of the legal issues raised in the complaint bears some relevance to our determination of a reasonable rate. We cannot fully credit the ACLU's affidavit in support of the proposed rates, which does not mention any of the case-specific variables that the Second Circuit has directed the district courts to consider in arriving at a reasonable rate.[10]  Indeed, most of the representative matters cited as support for Simmonds's rates appear to be extraordinarily complex, class action lawsuits requiring an enormous investment of time and resources.[11]  This case, by contrast, involved a single plaintiff asserting several novel theories of liability alongside a compelling traditional gender discrimination claim.[12]  In any

---

[10]
    We also note parenthetically that senior counsel in this case are not as experienced as two of Swartz's partners, Kathleen Peratis and Lewis Black, who were recently awarded an hourly rate of $600 in an employment discrimination action brought in this district.  See Rozell v. Ross-Holst, No. 05 Civ. 2936, 2008 WL 2229842, at *14 (S.D.N.Y. May 29, 2008) (lead counsel had close to forty years of employment law experience).

[11]
    Swartz Decl. ¶¶ 5, 6.

[12]
    As we noted supra, counsel also commenced the action on behalf of an unrelated plaintiff.

event, our independent knowledge of the rates charged by
attorneys for similar services and of recent awards in the
district for complex civil rights matters suggests that
Simmonds's rates are not reasonable. See, e.g., Heng Chan, 2007
WL 1373118, at *2-*3 (awarding $450/hour for lead counsel in
"unusually difficult and complex" case); Wise, 2008 WL 482399, at
*7-*9 (awarding $425/hour for lead counsel in a matter that was
"considerably more difficult and complex than the average civil
rights case").

Accordingly, we find that Simmonds's counsel should be
compensated at the following hourly rates: Lovi and Lapidus –
$425; Martin and Romansic - $325; Bettinger-Lopez and Martinez-
Olguin - $250, and Yablon - $225. See, e.g., Swartz Decl. ¶ 12
(acknowledging that $425/hour is within the range of "hourly
rates for experienced lawyers representing plaintiffs in
employment law litigation in this community"); Heng Chan, 2007
WL 1373118, at *2-*3 ($450/hour for the lead partner with sixteen
years of experience, $300/hour for sixth-year associates, and
$200/hour for a second-year associate); NOW v. Pataki, No. 93
Civ. 7146(RLC), 2003 WL 2006608, at *2 (S.D.N.Y. April 30, 2003)
($400 and $430 for lead counsel found reasonable); Insinga v.
Cooperatieve Centrale Raiffeisen Boerenleenbank B.A., 478 F.
Supp. 2d 508, 510 (S.D.N.Y. 2007) ($225/hour for attorney with

four years experience found reasonable); <u>Rozell</u>, 2008 WL 2229842, at *14 ($350 for senior associates and $250 for junior associates); <u>Rahman v. The Smith & Wollensky Restaurant Group, Inc.</u>, No. 06 Civ. 6198(LAK)(JCF), 2008 WL 1899938, at *4 (S.D.N.Y. April 29, 2008) ($350 for attorney with ten years experience).

As for the two paralegals on the case, we find that Reigel's services are compensable at the standard hourly rate of $100 but that Ajashvilli's substantial experience as a paralegal commands a higher rate of $140. <u>See, e.g.</u>, <u>Moon v. Kwan</u>, No. 99 Civ. 11810, 2002 WL 31512816, at *4 (S.D.N.Y. Nov. 8, 2002) (paralegals awarded $75 to $130 per hour depending on experience); <u>Sewell v. 1199 National Ben. Fund for Health and Human Services</u>, No. 04 Civ. 4474(JSR), 2007 WL 1434952, at *2 (S.D.N.Y. May 15, 2007) ($90/hour approved for paralegal); <u>Hnot v. Willis Group Holdings Ltd.</u>, No. 01 Civ. 6558(GEL), 2008 WL 1166309, at *3 (S.D.N.Y. April 7, 2008) ($150 per hour found reasonable).

## II. **Reasonable Number of Hours Expended**

We perceive four possible grounds for reducing the number of claimed hours: (i) the co-counsel arrangement between the ACLU and Steptoe led to overstaffing and duplication of effort; (ii) the billing records offered in support of the fee application are ambiguous as to whether the hours expended on issues relating to

-15-

counsel's former client, Henderson, and the non-settling defendant, Hall, have been excluded; (iii) time dedicated to seeking co-counsel in the matter and to drafting a consent decree cannot be recovered because it does not relate to Simmonds's claims; and (iv) counsel spent an excessive amount of time drafting and revising the instant fee application.  We consider each of these seriatim.


**A.    Overstaffing and Duplicative Work**

"The use of multiple attorneys . . . is not unreasonable per se."  Williamsburg Fair Housing Comm. v. Ross-Rodney Hous., 599 F. Supp. 509, 518 (S.D.N.Y. 1984).  As the Second Circuit has noted:

> In assessing the extent of staffing and background research appropriate for a given case, a district court must be accorded ample discretion. . . . [P]revailing parties are not barred as a matter of law from receiving fees for sending a second attorney to depositions or an extra lawyer into court to observe and assist. See Seigal v. Merrick, 619 F.2d 160, 164 (2d Cir. 1980). . . . Of course, a trial judge may decline to compensate hours spent by collaborating lawyers or may limit the hours allowed for specific tasks, but for the most part such decisions are best made by the district court on the basis of its own assessment of what is appropriate for the scope and complexity of the particular litigation.

New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1146-48 (2d Cir. 1983).  In addition to considerations of the scope and complexity of the litigation, the district court

must account for "duplicative or repetitive work" to ensure that the shifted fees represent only work that was "necessary to the litigation" and "a cost efficient use of co-counsel and outside counsel." Sullivan v. Syracuse Housing Authority, No. 89-CV-1205, 1993 WL 147457, at *3 (S.D.N.Y. May 3, 1993).

Simmonds claims that Steptoe was brought into the litigation "because of the firm's expertise in federal litigation and trial practice,"[13] and the ACLU attorneys, who "possess specialized substantive knowledge of the law," played more of a supervisory role in the matter. At rates comparable to those paid to civil rights litigators, a paying client may well have retained the Steptoe attorneys as co-counsel to draw on their experience in federal litigation and practice. However, such an arrangement would be palatable only if counsel were committed to ensuring that the total number of hours expended over the course of the litigation was not unreasonably increased thereby. Here, the billing records reveal several inefficiencies that belie such a commitment.

While the billing records indicate that the ACLU and the Steptoe attorneys often divided the work between them, they also suggest that the delegation of authority was rarely, if ever, complete and that litigation tasks were often assigned without

---

13
    Although we doubt that the ACLU lacks federal litigation and trial experience, we accept, for the present purposes, Simmonds's asserted rationale for seeking out co-counsel.

particular regard for any institutional advantages that one firm might have over the other.   The ACLU did not, as Simmonds contends, serve merely in an advisory or supervisory capacity to their more litigation-savvy co-counsel.   Rather, both firms were heavily involved in all aspects of the litigation, from drafting and revising the pleadings to reviewing discovery materials and preparing for depositions.   Attorneys from both firms routinely reviewed and revised each others' work product and jointly attended court conferences and meetings with clients and co-counsel.

Consequently, the total number of hours billed over the course of the litigation substantially exceeded what was reasonably required to prosecute Simmonds's straightforward claims.   See, e.g., Cho v. Koam Medical Services P.C., 524 F. Supp. 2d 202, 209-10 (E.D.N.Y. 2007); Lavely v. Redheads, Inc., No. 03 Civ. 7752(RMB)(KNF), 2007 WL 5267679, at *8 (S.D.N.Y. Oct. 12, 2007).   Simmonds's attorneys seek compensation for over 552 hours, which represents almost fourteen weeks of full-time work by a single attorney.   At that rate, a solo practitioner could accept only four representations a year and would hope to never take a deposition in any of those cases, surely a recipe for starvation.   See, e.g., DiFilippo v. Morizio, 759 F.2d 231, 235-26 (2d Cir. 1985) (finding 302 hours to litigate the matter to trial to be grossly excessive because "[i]f a self-employed lawyer were to work extremely hard and bill 2100 hours annually

on the same basis as plaintiffs' counsel here, his or her entire practice would consist of only seven simple cases such as this each year."). Even if we posited a litigation team consisting of one experienced partner and one junior associate, we cannot imagine how the various tasks performed by counsel could have taken more than a total of 200 hours, less time than that spent by either the ACLU or Steptoe on this matter.

There is no doubt that greater economies in attorney time could have been achieved if counsel had reasonably considered the staffing issues raised by their joint representation. By way of illustration, we note that Simmonds's attorneys spent approximately sixty (60) hours drafting and reviewing correspondence to each other and discussing the case internally. An aggregate of thirty (30) hours were billed by the second, third, fourth, and, often, fifth attorneys who attended court conferences and participated in conference calls and meetings with Simmonds and opposing counsel. Four attorneys spent a total of thirty (30) hours preparing Simmonds's first set of document requests and interrogatories, an astounding number considering that samples of these documents should be readily available in the ACLU's precedent libraries. See Rozell, 2008 WL 2229842, at *9. Also, over one hundred and forty-two (142) hours were billed for drafting and filing the complaint, notwithstanding the fact that the ACLU had already prepared Simmonds's EEOC charges, the Steptoe attorneys separately billed over forty (40) hours for a

-19-

research memorandum detailing the basis for Simmonds's claims, and the standard discrimination claims could have been copied from precedent materials. Counsel effectively spent over one hundred and eighty-two (182) hours preparing the complaint, certainly an excessive amount given that it corresponds to over one month of full time work by a single attorney. See, e.g., Lynch v. Town of Southampton, 492 F. Supp. 2d 197, 213 (E.D.N.Y. 2007) (93 hours for 43 page complaint found unreasonable).

Accordingly, we find that a forty (40) percent reduction in the total number of hours expended is necessary to correct for the inefficiencies resulting from the co-counsel arrangement and from the apparent willingness to conduct the litigation in an undisciplined manner.

### B.   **Ambiguities in the Billing Records**

The prevailing party's request for attorney's fees must be supported by contemporaneous time records, affidavits and other materials that permit an evaluation of whether the number of hours expended was reasonable. See Chambless v. Masters, Mates & Pilots Pension Plan, 885 F.2d 1053, 1058 (2d Cir. 1989); New York State Ass'n for Retarded Children, 711 F.2d at 1147-48. "These records should specify, for each attorney, the date, the hours expended, and the nature of the work done." Carey, 711 F.2d at 1147-48; see, e.g., Wilder v. Bernstein, 975 F. Supp. 276, 286 (S.D.N.Y. 1997). In the absence of relevant details, it is

nearly impossible for the court to assess the reasonableness of the time spent on each activity.  See Williams v. New York City Hous. Auth., 975 F. Supp. 317, 327 (S.D.N.Y. 1997) ("Fee applicants should not 'lump' several services or tasks into one time sheet entry because it is then difficult if not impossible for a court to determine the reasonableness of the time spent on each of the individual services or tasks provided . . . . It is not the court's job to decipher time entries and guess how much time each activity took . . . .") (internal citation omitted); Hnot, 2008 WL 1166309, at *5 ("A time entry is vague if it lacks sufficient specificity for the Court to assess the reasonableness of the amount charged in relation to the work performed."). Accordingly, "where adequate contemporaneous records have not been kept, the court should not award the full amount requested." F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1265 (2d Cir. 1987).

Here, the records are ambiguous as to whether a portion of the billed time was spent prosecuting the action on behalf of Sonya Henderson or developing the claims against Sean Hall. Given the substantial overlap between the legal and factual basis for the plaintiffs' claims, we appreciate that much of the requested time would have been billed even if Henderson and Hall had not been parties to the action.  See Marisol A. ex rel. Forbes v. Giuliani, 111 F. Supp. 2d 381, 390 (S.D.N.Y. 2000).  In this vein, counsel's affidavits in support of the motion indicate

-21-

that they have excluded the fees for work performed "exclusively" on behalf of Henderson or on the claims against Hall.[14] We fail to see the basis for this representation since the vast majority of the billing entries are fairly generic and do not specify either the client or the defendant to which the work related.[15] Task descriptions such as "prepare complaint,"[16] "draft complaint in Simmonds/Henderson,"[17] "drafted and edited complaint,"[18] "meeting with co-counsel and clients,"[19] "reviewed and edited draft interrogatories and document requests"[20] are facially inadequate to answer the question of whether the entirety of the associated fees ought to be borne by the City defendants. See id. ("[I]t would be difficult, if not impossible, to specifically identify the time spent by plaintiffs on issues unique to the State. Therefore, the Court will take this matter into consideration when it reduces plaintiffs' overall fee request."). Nor has Simmonds specifically identified the number of hours

---

14
    See Lovi Decl. ¶ 3; Lapidus Decl. ¶ 27.

15
    There has been no suggestion by counsel that their time was billed under separate client-matter numbers for Henderson and Simmonds. Indeed, the ACLU's billing records denote Henderson as the "client" and several entries in the Steptoe attorney's records refer to the matter as the "Henderson file" or the "Simmonds/Henderson case." Lovi Decl. Ex. A at 1, 2.

16
    Lovi Decl. Ex. A at 2.

17
    Id.

18
    Lapidus Decl. Ex. A at 6-7.

19
    Id. at 5.

20
    Id. at 11.

expended by her counsel on matters unrelated to her claims against the City defendants.

Accordingly, the fee request shall be further reduced by fifteen (15) percent to account for the reasonable probability that the requested hours include time expended on issues unique to Henderson and Hall.

### C.   "Unrelated" Matters

The City defendants contend that Simmonds should be denied compensation for two instances of work "unrelated" to her claims: (i) preparing a consent decree in response to the City defendants' offer of judgment, for which Simmonds's attorneys billed fifteen (15) hours; and (ii) discussing a potential co-counsel arrangement with Pillsbury Winthrop, LLC ("Pillsbury") for three (3) hours.

The hours expended by Simmonds's counsel in discussing and drafting a consent decree shall be deducted from the request. The "most critical factor" in a district court's determination of what constitutes reasonable attorney's fees in a given case is "the degree of success obtained" by the plaintiff. Farrar v. Hobby, 506 U.S. 103, 113-14 (1992); accord Kassim v. City of Schenectady, 415 F.3d 246, 255-56 (2d Cir. 2005) ("[B]ecause the plaintiffs had failed to win an injunction on terms more favorable to them, they had achieved only partial or limited success."). As the Second Circuit recently explained, "the

quantity and quality of relief obtained, as compared to what the plaintiff sought to achieve as evidenced in her complaint, are key factors in determining the degree of success achieved." Barfield v. New York City Health and Hospitals Corporation, -- F.3d --, 2008 WL 3255130 (2d Cir. Aug. 8, 2008) (citation and quotation marks omitted).   Simmonds's counsel has vigorously pursued injunctive relief against the City defendants from the outset of this case, and continued to do so even when the offer of judgment consisted solely of a monetary sum.   The effort expended in this regard was not only unreasonable because counsel began drafting the consent decree without first reaching an agreement on the principle terms, but ultimately not compensable because it bears no relationship to Simmonds's success in the matter.   Accordingly, although Simmonds was entitled to gamble and respond with a counteroffer that included a consent decree, the fees incurred by her counsel in that effort are not properly shifted to the City defendants.

As for the attempts to obtain co-counsel in the matter, we agree with Simmonds that "a reasonable attorney would have engaged in similar time expenditures." Grant v. Martinez, 973 F.2d 96, 99 (2d Cir. 1992).

### D.   The Instant Fee Application

Simmonds has not sought compensation for all of the time expended by her counsel on this motion, having withdrawn her

request for any of the Steptoe attorney's time in this regard and the ACLU's hours billed to the reply submissions. The City defendants argue that the balance of 64.81 hours is nevertheless an unreasonable amount of time to draft and file the motion. We disagree. Counsel must have expended substantial effort in redacting the privileged and non-compensable entries from the extensive billing records in this matter and in compiling the affidavits and other supporting materials documenting the credentials and relative contributions of seven attorneys and two paralegals.

## CONCLUSION

For the reasons stated herein, Simmonds is awarded costs in the amount of $1,551.28 and attorney and paralegal fees as follows:

**Motion for Attorney's Fees and Costs**

| Staff | Firm | Role | Hours Awarded | Rate ($) | Total Award($) |
|-------|------|------|---------------|----------|----------------|
| Lapidus | ACLU | Director | 2.26 | 425 | 960.5 |
| Martinez-Olguin | ACLU | Jr. Atty | 38.2 | 250 | 9550 |
| Reigel | ACLU | Paralegal | 24.35 | 100 | 2435 |

**Litigation Through Settlement**

| Staff | Firm | Role | Hours Awarded | Rate ($) | Total Award($) |
|-------|------|------|---------------|----------|----------------|
| Lapidus | ACLU | Director | 5.35 | 425 | 2273.75 |
| Martin | ACLU | Deputy Director | 18.18 | 325 | 5908.5 |
| Bettinger-Lopez | ACLU | Jr. Atty | 44.56 | 250 | 11,140 |
| Martinez-Olguin | ACLU | Jr. Atty | 49.48 | 250 | 12,370.5 |
| Reigel | ACLU | Paralegal | 8.58 | 100 | 858 |
| | | | | | |
| Lovi | Steptoe | Partner | 17.66 | 425 | 7505.5 |
| Romansic | Steptoe | Sr. Atty | 24.48 | 325 | 7956 |
| Yablon | Steptoe | Jr. Atty | 64.08 | 250 | 16020 |
| Ajashvilli | Steptoe | Paralegal | 13.5 | 140 | 1890 |

**Total:** $78,867.25

Dated:    New York, New York
             September 15, 2008

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on September 15, 2008 to the following:

Counsel for Plaintiffs

Emily J. Martin, Esq.
Lenora M. Lapidus, Esq.
Araceli Martinez-Olguin, Esq.
American Civil Liberties Union Foundation
Women's Rights Foundation
125 Broad Street, 18th Floor
New York, NY 10004

John D. Lovi, Esq.
Lara E. Romansic, Esq.
Marcia A. Yablon, Esq.
Steptoe & Johnson, LLP
750 Seventh Avenue
New York, NY 10019

Counsel for Defendant

Blanche Greenfield, Esq.
Office of the Corporation Counsel
City of New York
Law Department
100 Church Street
New York, NY 10007